2016 IL App (3d) 150717

Opinion filed July 7, 2016

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2016

| | | |
|---|---|---|
| *In re* MARRIAGE OF | ) | Appeal from the Circuit Court |
| | ) | of the 14th Judicial Circuit, |
| CECILIA VANCE, | ) | Rock Island County, Illinois, |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | Appeal No. 3-15-0717 |
| and | ) | Circuit No. 13-D-305 |
| | ) | |
| STEPHEN R. VANCE, | ) | Honorable |
| | ) | Clarence M. Darrow, |
| Respondent-Appellant. | ) | Judge, Presiding. |

PRESIDING JUSTICE O'BRIEN delivered the judgment of the court, with opinion.
Justices Carter and McDade concurred in the judgment and opinion.

**OPINION**

¶ 1     Respondent, Stephen R. Vance, appeals the trial court's order: (1) directing Stephen to

pay child support to petitioner, Cecilia Vance, in the amount of $825 per month; (2)

characterizing a house as marital property and awarding one-third of the equity in the house to

Cecilia; and (3) directing Stephen to pay Cecilia's attorney fees in the amount of $5,000.  We

affirm.

¶ 2                                          FACTS

¶ 3        Cecilia filed a petition for dissolution of marriage on June 19, 2013. The petition alleged that Cecilia and Stephen were married on August 11, 2007, and had two children during the marriage. Prior to their marriage, the parties executed a premarital agreement concerning the disposition of their property in the event of a dissolution of marriage.

¶ 4        On March 12, 2014, Stephen filed a financial disclosure statement, which stated, *inter alia*, that a company called "B E 2" had a judgment against Stephen in the amount of $120,000.

¶ 5        The parties filed a pretrial memorandum in which Cecilia reported having a gross monthly income of $3,293.33 and a net monthly income of $2,518.03. Stephen reported having a gross monthly income of $3,220 and a net monthly income of $1,320. Cecilia reported having monthly expenses in the amount of $3,077.04, and Stephen reported having monthly expenses in the amount of $2,900. Steven reported that he owned a house located at 2713 34th Street in Rock Island, Illinois (the 34th Street house), which had a market value of $175,000 and an outstanding debt of $170,000. Cecilia claimed the 34th Street house was marital property, while Stephen claimed it was nonmarital property.

¶ 6        In the pretrial memorandum, the parties stipulated they would share physical custody of their children, with the children being with each parent on alternating weeks. The parties also stipulated as to the division of most of their property. Specifically, the parties agreed that they would each receive all financial accounts, life insurance policies, and retirement accounts or benefits they held in their own names.

¶ 7        The parties stipulated that they would each pay their own debts which they had separately incurred. Additionally, the parties stipulated that Stephen would receive as his sole property: (1) a Chevrolet Tahoe; (2) his pickup trucks; (3) his boat; (4) his corporate interests in the Belgrade Tavern and the Torchlight Lounge, Inc., and any interest in the real estate at the two businesses;

2

and (5) his interest in his two rental houses. The parties stipulated that Cecilia would receive as her sole property; (1) a 2009 Toyota Avalon; and (2) a house in Moline, Illinois (which Cecilia acquired prior to the parties' marriage).

¶ 8 Additionally, the parties stipulated that their premarital agreement was valid. The intent of the premarital agreement was that the separate property of each party remain his or her separate property. With regard to separate property, the premarital agreement provided, in relevant part:

"Except as specifically provided for in this Agreement, separate property is that which is already owned ***. Property acquired in exchange for separate property shall remain the separate property of the party who owned the exchanged property. *** Proceeds of separate property, appreciation of property exchanged for separate property, and any other proceeds of the separate property or any property or proceeds obtained in exchange or replacement thereof or resulting from any investment, reinvestment, or substitution of any kind from any such property or the proceeds of any thereof, shall remain separate property. Marital property is property of a party or of the parties which is acquired after the marriage and not by Stephen or Cecilia's Business Entity and which is not separate property under this Agreement."

¶ 9 With regard to marital property, the premarital agreement provided:

" C. MARITAL PROPERTY

1. JOINT PROPERTY. In the event the parties during the marriage create any accounts, investments, or other assets which is held by the parties as 'joint tenants with right of survivorship', said accounts, investments, or other assets

3

shall be the marital property of the parties and shall be managed, handled and divided in accordance with the applicable laws regarding marital property, unless the parties provide to the contrary in a writing signed by both parties.

2. MARITAL RESIDENCE. The parties do not currently have a marital residence. Should the parties purchase a marital residence, they agree that in the event of a dissolution the property shall be split in accordance with the amount of equity each party put into the house. Said amount will be based upon the percentage each party has paid into the marital residence.

3. ASSETS OBTAINED WITH BORROWED FUNDS. Should the parties, or either of them, borrow any funds or acquire any asset or assets with borrowed funds during the marriage, such loan proceeds and/or any property acquired with such loan proceeds shall belong to the party or parties in the manner that title is held to same. Therefore, if the loan is made in the name of one party or if title to the property securing the loan is held in one party's name alone, the loan obligation as well as the loan proceeds and any property acquired by those loan proceeds shall be and remain that party's separate property and obligation, subject to change only as provided for in this Agreement. Such property can only be marital property or have any marital property interest if there exists an agreement in writing, signed by both parties, expressly creating such marital property or if title is held as 'joint tenants.' In such event, the obligation shall be a martial obligation as well."

¶ 10        A trial was held on May 26, 2015. The only disputed issues at trial were: (1) child support and expenses for the children; (2) Cecilia's attorney fees; (3) vacation custodial time; and (4) whether the 34th Street house was marital or nonmarital property.

¶ 11        Stephen testified that he resided at the 34th Street house. Stephen purchased the house during the marriage with funds he received from the sale of another house, which he owned prior to the marriage. Only Stephen's name appears on the mortgage, and Stephen always made the mortgage payments. Stephen also paid the real estate taxes, insurance, and maintenance on the 34th Street house. The cost of the 34th Street house was $119,000, and Stephen made improvements to the house valued at approximately $80,000. Stephen believed that the current value of the house was approximately $190,000 to $200,000.

¶ 12        Initially, the 34th Street house was titled only to Stephen. Subsequently, Stephen executed a quitclaim deed transferring the house to him and Cecilia as joint tenants. Stephen testified that he defaulted on a contract on which he was a personal guarantor to B E 2, a company from which he purchased a car wash business. B E 2 obtained a judgment against Stephen in the amount of approximately $270,000, and was attempting to collect on the judgment. Stephen executed the quitclaim deed to protect the house for his children. Stephen consulted with an attorney about the effect of signing the quitclaim deed. The quitclaim deed, dated August 20, 2013, was introduced into evidence. Stephen testified that he sold the car wash business at a significant loss in 2013.

¶ 13        Stephen testified that he was self-employed and was involved in a number of businesses. Stephen owned the Belgrade Tavern in Moline and owned an interest in the Torchlight Lounge, Inc., in East Moline. Stephen also owned two rental homes. One of his rental houses was currently occupied, but the other was not. Stephen received rent in the amount of $700 per

5

month from the occupied rental house. The unoccupied rental house previously rented for $800 per month. Stephen previously owned a tree business, which he closed two to five years prior to trial. Stephen also previously owned an interest in a six-plex which he sold over two years prior to trial.

¶ 14　　　Stephen testified that he had received a minimum wage salary of $8.25 per hour from Steve Vance Co., Inc., the corporation that operates the Belgrade Tavern, since November 2013. Prior to November 2013, Stephen did not receive a salary from the corporation. Stephen testified that the Belgrade Tavern paid for health insurance for Stephen and his children, Stephen's mortgage payment, and possibly his automobile insurance. Stephen testified that his health insurance cost approximately $280 per month and his daughters' health insurance cost approximately $500 per month. Stephen was not certain what his monthly mortgage payment was, but believed it was $1,200 to $1,600. Stephen owned the Belgrade Tavern's building personally; the business paid rent to Stephen for use of the building.

¶ 15　　　Stephen identified several financial statements for his businesses, which were introduced into evidence. The statements were prepared by Stephen's accountant based on Stephen's business records. Stephen testified that he tried to provide his accountant with accurate information regarding his income and expenses. The financial statements included statements for Steve Vance Co., Inc., and the Torchlight Lounge, Inc., for the years 2010 through 2012. Financial statements from businesses Stephen no longer owned, including his car wash business and tree business, for the years 2010 through 2012 were also introduced. In each of the statements, thousands of dollars of depreciation expenses were deducted from the entities' gross profits to reach the entities' net incomes.

¶ 16    The statements showed that Steve Vance Co., Inc. had gross profits in the amounts of $276,310.60 in 2010; $327,305 in 2011; and $315,173.91 in 2012. After deducting operating expenses, those statements showed net income in the amount of $25,052.92 in 2010; $7,819.15 in 2011; and $3,407.74 in 2012. Among the deducted expenses was depreciation in the amount of $24,563.46 in 2010; $42,633.83 in 2011; and $37,696.46 in 2012.

¶ 17    Similarly, the Torchlight Lounge, Inc., had gross profits in the amounts of $46,556.62 in 2010; $188,028.41 in 2011; and $152,408.19 in 2012. After deducting expenses, the statements showed a net loss of $21,172.23 in 2010; net income of $4,225.02 in 2011; and a net loss of $5,518.83 in 2012. Among the expenses deducted to arrive at these net figures was depreciation in the amounts of $13,614 in 2010; $24,821.80 in 2011; and $23,718.86 in 2012.

¶ 18    Stephen and Cecilia's joint tax returns for the years 2010 through 2012 were introduced into evidence. Stephen testified that he filed a 2013 tax return but did not remember if he provided copies of it to his attorney. Stephen had not yet filed a 2014 tax return. Stephen and Cecilia's tax return reported capital gains from Stephen's S-corporations in the amounts of $5,047 in 2010; $828 in 2011; and $15,803 in 2012. The tax returns also reported rental income. The corporate tax returns for Steve Vance Co., Inc., and Torchlight Lounge, Inc., for the years 2011 and 2012 were also introduced into evidence.

¶ 19    Cecilia testified that she was a site administrator at Expert Global Solutions in Davenport, Iowa, and earned an hourly wage of $19 per hour. Cecilia testified that she had earnings in the amount of $15,274 in 2013. Cecilia's 2013 tax return was entered into evidence. Cecilia testified that her income fluctuated from month to month because her overtime hours changed. Cecilia's pay stub for the period of December 20, 2014, through January 2, 2015, was entered into evidence. Cecilia's net pay during that period was $1,542.87. Cecilia testified that she had

7

an account balance with her attorney's office. Cecilia testified that she did not have money in savings or otherwise have funds immediately available to her to pay her attorney fees.

¶ 20　　　During closing arguments, Cecilia's counsel argued that Stephen's business depreciation was "an add back for child support calculation purposes." Cecilia's counsel argued that $1,000 per month was a reasonable child support payment for Stephen to pay Cecilia. Cecilia's counsel argued that Stephen had "income or income potential of approximately $100,000 a year" from his business ventures and rental properties, while Cecilia made approximately $39,500 per year at her hourly wage of $19 per hour. Cecilia's counsel asserted that Stephen's annual income was approximately $60,000 greater than Cecilia's and deducted one-third of the $60,000 for tax purposes to conclude that Stephen had "net additional income" in the amount of $40,000. Cecilia's counsel argued that if the court were to apply the statutory guideline of 28% of net income to Stephen's additional $40,000, Stephen's child support obligation would be approximately $1,000 per month.

¶ 21　　　Stephen's counsel argued that Stephen received income from one rental property and earned minimum wage from his business ventures. Stephen's counsel contended that Cecilia was equally able to pay child support and that child support should be "50/50."

¶ 22　　　The trial court entered a judgment of dissolution of marriage. The court gave effect to the parties' premarital agreement and accepted the stipulations contained in the pretrial memorandum. The trial court found the 34th Street house to be the parties' marital property by operation of the premarital agreement. The trial court awarded the home to Stephen but ordered Stephen to pay Cecilia $8,333.33, representing one-third of the equity in the home.

¶ 23　　　The trial court ordered Stephen to pay Cecilia child support in the amount of $825 per month. The judgment of dissolution stated: "After first setting off each parties' individual

8

income for child support calculation purposes, the Court finds that Stephen's remaining net income for child support calculation purposes is $40,000.00, or $3,333.00 per month." The trial court noted that Stephen had been paying for health insurance for the children in the amount of $500 per month. The trial court found that Stephen and Cecilia had a joint responsibility to provide health insurance for the children and allocated the cost of health insurance between them *pro rata* based on their incomes, such that Cecilia was responsible for paying $150 per month and Stephen was responsible for paying $350 per month. The trial court then added the $150 for which Cecilia was responsible to Stephen's monthly income, increasing Stephen's net income to $3,483 per month. The trial court set Stephen's child support obligation at $975 per month, less Cecilia's share of the health insurance in the amount of $150, for a total of $825 per month.

¶ 24 Additionally, the trial court ordered Stephen to pay $5,000 toward Cecilia's attorney fees.

¶ 25 Stephen filed a motion to reconsider arguing, among other things, that the trial court failed to consider that Stephen had custody of the children 50% of the time in determining child support. At the hearing on the motion to reconsider, Stephen's counsel argued that the trial court set child support without giving Stephen credit for having custody of the children 50% of the time. The trial court responded: "[T]he $3,333 is after offset and the add back for depreciation." The trial court explained: "I'm using the offset method. She pays him 28 percent; he pays her 28 percent, and to effectuate that we cancel out–we net out their incomes." The trial court then asked Stephen's counsel:

> "So *** would you want, then, the order to add back in, rather than using the shorthand, add back in all Cecilia's income and all of Stephen's income and then come up with a much higher number that Stephen would pay Cecilia and a

9

number that Cecilia would be paying Stephen and then have the math show what it shows so that Stephen ends up paying the same result?"

¶ 26 After conferring with Stephen, Stephen's counsel stated that Stephen was withdrawing his request to change the child support. Stephen's counsel then stated that he misunderstood his client and conferred with Stephen again. Stephen's counsel then said: "Our discussion *** is that the incomes are so approximately even at the end of the day that, if he pays child support, he should get credit for that."

¶ 27 The trial court denied the motion.

¶ 28 ANALYSIS

¶ 29 On appeal, Stephen argues that the trial court abused its discretion in: (1) calculating child support; (2) characterizing the home as marital property and awarding one-third of the equity in the home to Cecilia; and (3) directing Stephen to pay Cecilia's attorney fees in the amount of $5,000. We address each argument in turn.

¶ 30 I. Child Support

¶ 31 Stephen argues that the trial court erred in ordering him to pay $825 per month in child support[1] because the trial court: (1) failed to account for the fact that Stephen and Cecilia shared custody of their children; and (2) erred in failing to subtract depreciation from Stephen's net income. For the reasons that follow, we find that Stephen's contentions of error are not supported by the record.

¶ 32 A. Shared Custody

---

[1]Stephen asserts in his brief that the trial court ordered him to pay $975 per month in child support. After deducting Cecilia's share of the health insurance from Stephen's net income, the trial court actually ordered Stephen to pay $825 per month in child support.

¶ 33    Stephen argues that the trial court abused its discretion in ordering him to pay 28% of his net monthly income in accordance with the statutory guidelines. Specifically, Stephen argues that the court, in making its 28% decision, failed to take into consideration that Stephen and Cecilia shared custody of the children, with each parent having the children 50% of the time.

¶ 34    The guidelines found in section 505(a)(1) of the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/505(a)(1) (West 2014)) provide that where the parties to a dissolution proceeding have two children, the minimum amount of child support is 28% of the supporting party's net income. Where, as here, custody is shared, the trial court is not obligated to determine child support according to statutory guidelines. Rather, "the court may apportion the percentage between the parents [citation], or may disregard the statutory guidelines in the Act and instead consider the factors listed in section 505(a)(2) [of the Act]." *In re Marriage of Reppen-Sonneson*, 299 Ill. App. 3d 691, 695 (1998). "The findings of a trial court as to net income and the award of child support are within its sound discretion and will not be disturbed on appeal absent an abuse of discretion." *In re Marriage of Nelson*, 297 Ill. App. 3d 651, 655 (1998).

¶ 35    In the instant case, we find no abuse of discretion in the trial court's order that Stephen pay $825 per month in child support. Contrary to Stephen's contention, the record shows that the trial court did not merely apply the statutory guideline to Stephen's net income without taking into consideration that Stephen and Cecilia shared custody of the children. This was clarified at the hearing on Stephen's motion to reconsider when the trial court stated that it used the "offset method" to calculate child support. The trial court explained: "She pays him 28 percent; he pays her 28 percent, and to effectuate that we cancel out–we net out their incomes." Thus, to arrive at the number of $40,000 per year for Stephen's net income upon which it applied the statutory

11

guideline percentage, the trial court first "net[ted] out" Stephen's and Cecilia's total incomes. The trial court applied the statutory percentage to the difference between Stephen's and Cecilia's net incomes. Such a method is virtually the same mathematically as apportioning the percentage between the two parties. See *Reppen-Sonneson*, 299 Ill. App. 3d at 695 (holding that apportioning the statutory guideline percentage for child support between the two parties is appropriate in shared custody cases).

¶ 36     We note that although the trial court did not explicitly state in its judgment what it found Stephen's and Cecilia's total incomes to be before it netted them out to arrive at the $40,000 figure, the trial court's *pro rata* allocation of the health insurance obligations based on the parties' incomes—with Stephen paying $350 per month and Cecilia paying $150 per month—indicated that the trial court found Stephen's total income was more than double that of Cecilia.

¶ 37     The record supports the trial court's finding. See *Northern Moraine Wastewater Reclamation District v. Illinois Commerce Comm'n*, 392 Ill. App. 3d 542, 563 (2009) ("On review, [the appellate court] may affirm on any basis supported by the record."). Evidence at trial of Cecilia's hourly wage established that her income was approximately $39,500 per year. The evidence at trial established that Stephen's business income for Steve Vance Co., Inc. and the Torchlight Lounge, Inc. was approximately $75,107.23 for the year 2012.[2] Stephen's income from those two businesses was similar in 2011 and somewhat less in 2010, the year he purchased the Torchlight Lounge, Inc. Additionally, at the time of trial, Stephen had rental income of

_____

[2]In 2012, Steve Vance Co., Inc. had profits of $3,407.74 and depreciation in the amount of $37,969.46. The Torchlight Lounge, Inc. had a net loss of $5,518.83 and depreciation in the amount of $23,718.86. Additionally, Stephen had capital gains in the amount of $15,803 from his S-corporations.

$8,400 per year from his occupied rental home. Stephen also had an unoccupied rental home that had the potential to generate $9,600 per year in income when occupied.

¶ 38 Stephen complains that "it almost is impossible to determine the exact method the trial court used to determine Stephen's gross or net incomes or the resulting $975.00 in monthly child support." We find that Stephen has waived his argument that the trial court's method for determining his income was unclear. See *Batterman v. Consumers Illinois Water Co.*, 261 Ill. App. 3d 319, 321 (1994) ("Waiver is an express or implied voluntary and intentional relinquishment of a known and existing right.") At the hearing on the motion to reconsider, which the record shows was somewhat contentious, the trial court asked Stephen if "rather than using the shorthand," he wanted the order to show the amount that Cecilia would pay Stephen, the higher amount that Stephen would pay Cecilia, and "then have the math show what it shows so that Stephen ends up paying the same result?" Stephen did not accept the court's offer to more clearly describe its calculation in the order.

¶ 39                                    B. Depreciation

¶ 40 We reject Stephen's argument that the trial court abused its discretion in failing to subtract depreciation from his net income under section 505(a)(3)(h) of the Act (750 ILCS 5/505(a)(3)(h) (West 2014)). Specifically, Stephen claims that the trial court should have subtracted the depreciation amounts that Stephen's income tax and financial statements showed he claimed on his businesses and rental properties.

¶ 41 Section 505(a)(3)(h) provides that in calculating net income for purposes of determining child support, the trial court should deduct:

>  "Expenditures for repayment of debts that represent reasonable and necessary
>  expenses for the production of income, medical expenditures necessary to

13

preserve life or health, reasonable expenditures for the benefit of the child and the other parent, exclusive of gifts." *Id.*

¶ 42 Thus, to claim a deduction for depreciation under section 505(a)(3)(h) of the Act, the proponent must demonstrate: "(1) that the expense is a reasonable and necessary expense for the production of income; and (2) that it falls into the category of debt repayment as evidenced by a specific repayment schedule." *Nelson*, 297 Ill. App. 3d at 655. This court has disallowed deductions for depreciation under section 505(a)(3)(h) of the Act where the proponent failed to present evidence that the depreciation was a debt repayment expense. See *id.* at 655-56; *In re Marriage of Minear*, 181 Ill. 2d 552, 560 (1998).

¶ 43 In the instant case, Stephen failed to present evidence showing the grounds for his various depreciation deductions. Contrary to Stephen's argument on appeal, merely acknowledging his depreciation deductions during his trial testimony did not constitute "explaining the basis for the depreciation deduction." In the absence of specific evidence that Stephen's depreciation constituted actual debt repayment, the trial court did not abuse its discretion in failing to deduct the depreciation from Stephen's net income.

¶ 44 II. 34th Street House

¶ 45 With regard to the 34th Street house, Stephen argues that the trial court erred in its: (1) determination that the house was marital property; and (2) award of one-third of the equity in the house to Cecilia. Both arguments lack merit in light of the express terms of the parties' premarital agreement.

¶ 46 A. Classification as Marital Property

¶ 47 Stephen argues that the trial court incorrectly interpreted the premarital agreement in determining that the 34th Street house, to which Stephen and Cecilia held title as joint tenants,

14

was marital property. Because we find that the premarital agreement explicitly classified joint property as marital property, we disagree.

¶ 48 "The rules governing the interpretation of contracts also apply to the interpretation of antenuptial agreements." *In re Marriage of Murphy*, 359 Ill. App. 3d 289, 300 (2005). When construing a contract, the court's primary goal is to " 'decide and give effect to the intent of the parties as it is expressed through the words of the contract.' " *In re Marriage of Rosenbaum-Golden*, 381 Ill. App. 3d 65, 72 (2008) (quoting *In re Marriage of Best*, 369 Ill. App. 3d 254, 266 (2006)). " 'When a contract is unambiguous, a court must decide the intent of the parties solely from the contract's plain language.' " *Id.* (quoting *Best,* 369 Ill. App. 3d at 266).

¶ 49 Regarding joint property, the premarital agreement provided:

"1. JOINT PROPERTY. In the event the parties during the marriage create any accounts, investments, or other assets which is held by the parties as 'joint tenants with right of survivorship', said accounts, investments, or other assets shall be the marital property of the parties and shall be managed, handled and divided in accordance with the applicable laws regarding marital property, unless the parties provide to the contrary in a writing signed by both parties."

¶ 50 Under the above provision of the premarital agreement, the 34th Street house became marital property when Stephen executed the quitclaim deed conveying the house to him and Cecilia as joint tenants.

¶ 51 In coming to this conclusion, we reject Stephen's argument that the 34th Street house was his separate property rather than marital property under the premarital agreement on the basis that the 34th Street house was purchased with proceeds from the sale of a house that Stephen owned as separate property prior to the marriage. When Stephen initially purchased the house

with his separate funds with the title and mortgage in his name alone, the house was Stephen's separate property under the premarital agreement. When Stephen executed the quitclaim deed creating the joint tenancy, however, the section of the premarital agreement classifying joint property as marital property was invoked and the 34th Street house ceased being Stephen's separate property.

¶ 52                              B. Award of One-Third of the Equity to Cecilia

¶ 53        Stephen argues that even if we find that the trial court properly classified the 34th Street house as marital property under the premarital agreement, Cecilia was not entitled to any of the equity in the home. "A trial court's division of marital property will not be reversed absent an abuse of discretion." *Nelson*, 297 Ill. App. 3d at 658.

¶ 54        The portion of the premarital agreement regarding joint property provided that joint property was the marital property of the parties and "shall be *** divided in accordance with the applicable laws regarding marital property, unless the parties provide to the contrary in a writing signed by both parties." Section 503(d) of the Act (750 ILCS 5/503(d) (West 2014)) controls the division of marital property. Section 503(d) provides that the trial court "shall divide the marital property without regard to marital misconduct in just proportions considering all relevant factors." *Id.* Section 503(d) goes on to list relevant factors, including, *inter alia,* each party's contribution to the acquisition of the marital or nonmarital property, the relevant economic circumstances of each spouse, the occupation of each spouse, the amount and sources of income of each spouse, the liabilities of each spouse, and "the reasonable opportunity of each spouse for future acquisition of capital assets and income." 750 ILCS 5/503(d)(1)-(12) (West 2014).

¶ 55        Applying the statutory factors, the trial court's award of one-third of the equity in the house to Cecilia was proper considering that Stephen's financial circumstances—including his

income and assets—were more favorable than Cecilia's. Additionally, the trial court's award of two-thirds of the equity in the house to Stephen can be interpreted as acknowledging Stephen's financial contribution to the acquisition and maintenance of the house. Thus, we find no abuse of discretion in the trial court's division of the equity in the 34th Street house.

¶ 56 In coming to this conclusion, we reject Stephen's argument that the trial court's award of one-third of the equity to Cecilia constitutes an abuse of discretion in light of the fact that the trial court allocated a creditor's judgment of $270,000 to Stephen. First, the trial court did not *allocate* any outstanding debt to Stephen; the parties *agreed by stipulation* to assume debts they separately incurred. Additionally, it was unclear from the trial testimony whether Stephen still owed all or any of the $270,000 judgment. Stephen did not testify at trial or disclose in the pretrial memorandum that the $270,000 judgment was a current debt. However, Stephen did previously state in his financial statement that B E 2 had a judgment against him in the amount of $120,000.

¶ 57 Additionally, we reject Stephen's argument that Cecilia is not entitled to any of the equity in the house under the following provision of the premarital agreement:

> "2. MARITAL RESIDENCE. The parties do not currently have a marital residence. Should the parties purchase a marital residence, they agree that in the event of a dissolution the property shall be split in accordance with the amount of equity each party put into the house. Said amount will be based upon the percentage each party has paid into the marital residence."

¶ 58 The above section of the premarital agreement contemplated the parties purchasing a marital residence together. It does not apply to the instant situation where Stephen purchased a home with his separate funds and subsequently transferred the house into joint tenancy with

17

Cecilia. We reassert our finding that the provision of the premarital agreement regarding joint property applies to the classification and division of the 34th Street house.

¶ 59                                      III. Attorney Fees

¶ 60        Finally, Stephen argues that the trial court abused its discretion in ordering him to pay $5,000 toward Cecilia's attorney fees under section 503(j) and 508 of the Act (750 ILCS 5/503(j), 508 (West 2014)). Specifically, Stephen contends that he lacks funds to pay Cecilia's fees and that Cecilia had greater means to pay her attorney fees at the time the judgment was entered given that: Cecilia earns $19 per hour while Stephen earns $8.25; Stephen was ordered to pay monthly child support to Cecilia; Cecilia would have sufficient funds to pay her attorney once she received her child support payments and the $8,333.33 home equity payment from Stephen; and a creditor was trying to collect a judgment against Stephen in the amount of $270,000.

¶ 61        "The propriety of an award of attorney fees is dependent upon a showing by the party seeking them of an inability to pay and a demonstration of the ability of the other spouse to do so." *In re Marriage of Bussey*, 108 Ill. 2d 286, 299-300 (1985). "In this context, however, financial inability does not mean destitution; the spouse need not exhaust his or her own estate." *In re Marriage of Los*, 136 Ill. App. 3d 26, 33-34 (1985). A trial court's award of attorney fees will not be disturbed on review absent an abuse of discretion. *Bussey*, 108 Ill. 2d at 299.

¶ 62        Based on the evidence presented at trial, the trial court's order that Stephen pay $5,000 toward Cecilia's attorney fees was not an abuse of discretion. Cecilia testified that she earned $19 per hour. Cecilia's counsel argued that her hourly wage amounted to approximately $40,000 per year. Cecilia also testified that she owed attorney fees and lacked savings or other funds with which to pay her fees.

18

¶ 63        Additionally, the evidence presented at trial showed that Stephen had the financial ability to pay Cecilia's attorney fees.  Based on the trial evidence, the trial court determined that Stephen's annual income from various sources was more than double that of Cecilia.  In addition, Stephen's assets far exceeded Cecilia's.  Cecilia owns a 2009 Toyota Avalon and a house as her separate property.  Stephen owns the 34th Street house, two rental homes, the building where the Belgrade Tavern is located, corporate interests in the Belgrade Tavern and the Torchlight Lounge, Inc., a Chevrolet Tahoe, multiple pickup trucks, and a boat.

¶ 64        We reject Stephen's contention that Cecilia has greater income than him because she makes $19 per hour while he makes only $8.25.  Unlike Cecilia, Stephen's hourly wages do not reflect his true income because Stephen is paid an hourly wage by a business *he owns*.  He determines the amount to pay himself in hourly wages from Steve Vance Co., Inc., and his hourly wages do not take into account the business profits he retains.  Stephen had operated the Belgrade Tavern prior to 2010 but did not begin paying himself a salary from that business until November of 2013.  Additionally, the Belgrade Tavern pays Stephen's mortgage payment, car insurance, and health insurance.  He also has income from his rental home and from the Torchlight Lounge, Inc.[3]

¶ 65                                    CONCLUSION

¶ 66        The judgment of the circuit court of Rock Island County is affirmed.

¶ 67        Affirmed.

---

[3]We reassert our finding that the evidence at trial was insufficient to establish that the $270,000 judgment was a current debt of Stephen's.  Therefore, we do not consider it in our analysis.