NOTICE
Decision filed 05/14/21. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2021 IL App (5th) 200326-U

NO. 5-20-0326

IN THE

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | | |
|---|---|---|
| *In re* MARRIAGE OF | ) | Appeal from the |
| | ) | Circuit Court of |
| DANIEL H. BURNETT, | ) | Massac County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| and | ) | No. 15-D-55 |
| | ) | |
| JENNIFER D. BURNETT, | ) | Honorable |
| | ) | James R. Williamson, |
| Respondent-Appellant. | ) | Judge, presiding. |

_____

JUSTICE MOORE delivered the judgment of the court.
Presiding Justice Boie and Justice Barberis concurred in the judgment.

**ORDER**

¶ 1    *Held*: The judgment of the circuit court of Massac County is affirmed in part, vacated in part, and remanded with instructions because the circuit court's findings regarding the minor child's best interest are not against the manifest weight of the evidence, the circuit court properly considered the mental health expert and guardian *ad litem* reports, the circuit court did not abuse its discretion in determining reimbursement to the marital estate, in determining the division of the marital property, and determining its award of attorney fees; however, it did err when it allowed the petitioner to claim accelerated depreciation of his businesses in determining income for the child support award and where petitioner failed to put forth any evidence as to the composition of the business depreciation or whether it was reasonable and necessary for the production of income and to carry on the business.

1

¶ 2    The respondent, Jennifer D. Burnett, appeals the judgment of allocation of parental responsibilities, the order of support, and the amended judgment for dissolution of marriage entered on September 11, 2020, by the circuit court of Massac County that determined the best interest of the minor child, J.B., allocation of parenting time, primary residence of the minor, the distribution of the marital estate, the amount of awards for reimbursement to the marital estate, attorney fees, and child support. For the following reasons, we affirm in part, vacate in part, and remand with instructions.

¶ 3                                    BACKGROUND

¶ 4    At the outset, we note that this is an expedited appeal, pursuant to Illinois Supreme Court Rule 311(a) (eff. July 1, 2018), because it involves the custody of an unemancipated minor. The decision was due to be filed on March 8, 2021. However, the decision is being issued beyond this date for good cause, as multiple motions for extensions of time resulted in delays of the progression of this case. See Ill. S. Ct. R. 311(a)(5) (eff. July 1, 2018). The case was set for the court's March 25, 2021, setting as a nonoral matter. After the case was set, there were some further delays and extensions regarding the filing of briefs and the unfortunate death of a family member of one of the participating attorneys. As a result, the briefing schedule was finally completed on April 7, 2021. We now issue our disposition.

¶ 5    Daniel Burnett (Daniel) and Jennifer Burnett (Jennifer) married in 2008. The parties have one minor child together, J.B., who was born July 18, 2012. The parties each filed for divorce in 2015. Jennifer filed for divorce in Johnson County, Illinois, and at that time also filed a verified petition for order of protection. Johnson County was eventually

2

determined to be an improper venue and the case proceeded in Massac County, Illinois, where Daniel had later filed a petition for dissolution of marriage.

¶ 6    This case proceeded over the course of approximately five years in the trial court. The initial portion of the dissolution proceedings dealt with a myriad of discovery issues and continuances while the parties primarily focused on disputing the issue of parenting time regarding the parties' minor daughter, J.B.

¶ 7    On August 24, 2015, a temporary order was entered awarding Daniel parenting time on alternating weekends from Friday at 3 p.m. to Sunday at 6 p.m., every Tuesday from 3 p.m. to Wednesday at 4 p.m., and every Thursday from 8 a.m. to 4 p.m. Attorney Eugenia Hunter (Hunter) was appointed as J.B.'s guardian *ad litem* (GAL) and the parties were ordered to split the costs of the GAL equally. On May 5, 2016, Jennifer filed her first proposed parenting plan, asking that J.B. reside with her and have parenting time with Daniel on alternating weekends from Friday to Sunday and Wednesdays from 3 p.m. to 8 p.m. and for the parties to share parenting responsibilities, other than for extracurricular activities, which she requested she be awarded solely.

¶ 8    On May 12, 2016, Daniel filed his parenting plan, asking that the parties share parenting responsibility in all categories except education, which he asked to be granted insomuch as he asked that J.B. be directed to continue attending school in Massac County, where he resided. He asked for the parties to share parenting time equally in a schedule that called for J.B. to reside with Daniel, with almost equal time provided for Jennifer.

3

¶ 9   On May 19, 2016, Daniel filed a motion directed at the issue of J.B.'s preschool location, holiday schedule, and additional parenting time. On October 28, 2016, the GAL recommended that the best interests of the minor child would be served by increasing the amount of time she spent with Daniel. On November 8, 2016 , Jennifer filed a petition for temporary child support and a petition for interim attorney fees. On November 18, 2016, the parties entered into an agreed order establishing that J.B. would continue to attend preschool at Maple Grove Elementary School, setting out a full holiday schedule, and providing for two weeks of vacation time for each parent. An eight-hour right of first refusal was to apply should either parent be unable to care for the child during his or her time. Also on that date, the trial court granted Daniel's previously filed motion requesting a mental health expert be appointed to review the case. Dr. Sarah Shelton, a licensed clinical psychologist, was appointed as the trial court's mental health professional.

¶ 10   On December 16, 2016, an agreed order for revision of temporary order of August 24, 2015, was entered. This order provided Daniel with parenting time on alternating weekends from Friday at 3 p.m. until the time school starts on Monday, and every Tuesday from 3 p.m. until Wednesday at 5:30 p.m., and Thursday from 8 a.m. until Thursday at 5:30 p.m. in weeks he has weekend parenting time, or until Friday morning at the beginning of school in weeks that he does not have weekend parenting time. He was also awarded the right of first refusal on days that J.B. did not have school and Jennifer was working.

¶ 11   On January 13, 2017, the trial court ordered, pursuant to an agreement between the parties, that Daniel pay $4500 for Jennifer's attorney fees. On June 17, 2017, Dr.

Shelton's report was filed with the trial court. The report, *inter alia*, concluded that neither party suffered from any mental health issues that would interfere with parenting and that it was in the child's best interests that she spend equal amounts of parenting time with each parent.

¶ 12   On January 29, 2019, GAL Hunter filed her initial report with the trial court. Hunter's report stated that she met with each parent alone in her office and also with the child in her office. She also made unannounced visits to the parties' homes in 2016 and 2018. She reviewed all of the orders entered in the case which had been filed to that point, the custody evaluation of Dr. Shelton, medical records, school records, police reports, discovery, and hundreds of messages between the parties and from counsel representing the parties. Hunter spoke with the day care provider, the principal, and a teacher of J.B.'s school, police officers, Alyssa Driver, Alexis Burnett (Daniel's older daughter), Nelda Burnett (Daniel's stepmother), Rollo Burnett (Daniel's father), and Margaret Kommer (Jennifer's mother). Hunter applied the factors regarding best interests and determined that it was in the best interests of J.B. for the parties to share parenting time equally, and that this case lent itself to a week-on/week-off schedule, with a visit in the middle of the week for the parent not exercising parenting time that week, or a 5/2/2/5 schedule. She recommended that the parties share all parenting responsibility.

¶ 13   Prior to trial, the parties stipulated that the residential home of the parties was worth $240,000. The court approved the stipulation. The day before evidence was to begin, Jennifer filed another proposed parenting plan and requested that the parties share all parenting responsibility except for education, which she wanted to be granted solely.

5

In this plan, she proposed that her address be considered J.B.'s residential address for school purposes and that she be awarded all parenting time during the school year except for alternating weekends and Wednesday overnights. In the summer when school was out, she proposed that she and Daniel split each week equally. She asked the trial court to order that she provide health insurance for J.B., but that Daniel be responsible for all extraordinary expenses and also pay child support. Jennifer also requested she be allowed to claim J.B. every year on her taxes.

¶ 14    On May 3, 2019, the bench trial began. The testimony of the parties at trial was elicited on various days between May 3, 2019, and February 28, 2020. The testimony presented at trial spans nearly 1400 pages, so for brevity, we discuss here only the relevant testimony of those who testified during trial.

¶ 15    *Rollo Burnett*

¶ 16    Rollo Burnett (Rollo) testified that he is Daniel's father. He has been a farmer his whole life, residing in Metropolis. Rollo is the owner of Burnett Farms, Inc. (Burnett Farms). The company farms 3300 acres of land, 2400 of which he owns through a revocable trust. Both Daniel and another son, Christopher Burnett, are employed by Burnett Farms and are paid an annual salary of $37,200 per year. Burnett Farms has entered into written leases with both Daniel and Christopher to rent separate tracts of land they each own for farming. Rollo explained that as sole owner of Burnett Farms, he pays the expenses associated with the business operations and keeps all income. Rollo testified that Daniel uses the cash rent he receives from leasing his property to Burnett Farms to pay the mortgage owed on that same property.

6

¶ 17    Rollo also testified that a normal workday on the farm differed depending on the time of year. During planting and harvesting season, the workdays are longer, sometimes requiring a 12-hour workday or more. However, Rollo stated that when Daniel has J.B., Daniel takes her to school in the morning and does not begin work until afterward. On occasion, if Daniel needs to run an errand or work late, he may take J.B. along with him. Daniel works more when he does not have parenting time with J.B. to help make up for the time he takes off to be with her on the days she is with him. Overall, Daniel works less since he and Jennifer separated and no longer works the long hours he previously did during the marriage.

¶ 18    Rollo is aware of Daniel's trucking company and that Daniel does necessary tasks for his trucking company while working for Rollo. These tasks mainly consist of making phone calls.

¶ 19    Rollo testified that overall safety in farming and farming equipment has improved with technology over the years. All of the farming equipment now has additional safety features, such as automatic shutoffs. He testified that there has never been a major accident at Burnett Farms.

¶ 20    Rollo estimated that when J.B. is in Daniel's care, he is with her 90% of the time. The other 10% someone else may be assisting, such as he or his wife, Nelda. Rollo helps J.B. with homework once or twice a month. His wife Nelda has helped J.B. on several occasions.[1]

---

[1]We note that it appears that pages 30 through 38 of Rollo's testimony were not properly copied into the record. Thus, this portion of his testimony is not before this court. Ultimately, this court has determined that even

¶ 21   *Nelda Burnett*

¶ 22   Nelda Burnett (Nelda) testified that she is Rollo's wife and Daniel's stepmother. She described Daniel and J.B.'s relationship as being close and that they interacted well. She believed Daniel was very attentive to J.B.'s needs. On occasion, Nelda picks J.B. up from school so that J.B. can play with her cousins and visit with them. On the days that she picks J.B. up from school, Nelda helps J.B. and her cousins with their homework. She testified that on the days she does not pick J.B. up from school, J.B. is with Daniel. J.B. is "very close" with her cousin, Chrisalynn. The two girls like to play school, dress-up dolls, play games, and both love animals.

¶ 23   *Alyssa Driver*

¶ 24   Alyssa Driver testified that she was hired by Daniel in 2009 as an employee of his trucking company. She was in charge of handling paperwork, invoicing, billing, payroll, and other administrative matters. Originally, Daniel handled the "dispatching" of drivers and trucks, but Alyssa now does the vast majority of this portion of the business. Dispatching involves calling brokers, finding loads in need of hauling, getting load sheets, and directing drivers to where they are needed. Alyssa testified that as the business became more established there was less need for Daniel to make contacts or search for loads to be hauled. At the time of her testimony, she was responsible for answering most of the phone calls requesting hauling services and she was conducting most of the logistics concerning that aspect of the business. As the business progressed,

---

without these pages, we have sufficient evidence from Rollo, combined with the other parties, to rule on the issues presented in this appeal.

Daniel began focusing on networking and public relations for the company. Daniel was able to do much of this while he was working the field on a tractor or sprayer. In 2011 or 2012, the business downsized when the company moved from paper logs to electronic logs, from approximately 12 to 6 drivers.

¶ 25   Following this downsize in the business, Alyssa began to assist Daniel's father's business, Burnett Farms, with their operations. She estimated she spent about 20 to 25% of her time on the farm operations. For the past four or five years, Daniel has stopped coming into the trucking business office, other than once a week to get paperwork.

¶ 26   Following the separation of Daniel and Jennifer, Daniel moved his work office out of his official trucking company's office into his home so that he could operate the majority of the trucking business from his house, as well as run the administrative aspects of his farming business from his house. Alyssa testified that around July of 2015 she began helping with J.B. on occasion, such as picking her up from school, helping with homework, and taking her to Daniel when needed.

¶ 27   Alyssa testified that Daniel and J.B. play board games, musical chairs, and tag. They also go on trips to get ice cream. Alexis Burnett, Daniel's oldest daughter, also joins them occasionally. Alyssa testified that Daniel was physically with J.B. 85 to 90% of the time during his parenting time with her. Alexis, Rollo, and Nelda also spend time with J.B. during Daniel's parenting time. J.B. has two dogs, a cat, and two rabbits at Daniel's house, and she loves to see the cows and donkey at Daniel's brother's house.

¶ 28   Alyssa testified that she was close to the Burnett family. On occasion she has traveled with Daniel, J.B., and Alexis on trips. She stated that for a short period of time

prior to the trial, she and Daniel became sexually involved, but denied that any physical relationship was ongoing. At the time of the trial, Daniel was dating Sarah Wittig.

¶ 29    *Arnold Williams*

¶ 30    Arnold Williams testified that he previously dated Jennifer's mother, Margaret Kommer, for two years. He owned the house Jennifer rented in Paducah and lived next door to her. He testified that in the past he had seen J.B. get upset when it was time for her to spend time with Daniel. However, it had been more than a year since he had witnessed this type of behavior occur. He believed that J.B. and Jennifer have a close relationship.

¶ 31    *Sherry Godfrey*

¶ 32    Sherry Godfrey testified that she was J.B.'s first grade teacher. She stated that both Jennifer and Daniel are involved in J.B.'s education and school activities. She testified that J.B. was initially shy but has become more outgoing and vocal. J.B. is an excellent student and likes learning. On one occasion, when J.B. was upset, Godfrey helped J.B. email Jennifer to tell her that she missed her during class.

¶ 33    *Mendi Sounders*

¶ 34    Mendi Sounders testified that her daughter is in Girl Scouts and cheerleading with J.B. She testified that both Jennifer and Daniel attend the girl scout meetings and basketball games. She testified that she has witnessed J.B. interact with both parents. According to Sounders, J.B. seems closer to her mother.

¶ 35   *Margaret Kommer*

¶ 36   Margaret Kommer is Jennifer's mother. She testified that she attends many of J.B.'s events, such as her gymnastics lessons, school parties, and plays. She testified that Daniel attends some of these events, but not all of them.

¶ 37   Margaret testified that in 2015 and 2016, she observed J.B. cry when it was time to go see her father. Throughout 2017 and 2018, this issue improved, but J.B. still sometimes expresses displeasure about having to go to parenting time with her father. Margaret testified that J.B. and Jennifer are very close. In 2017, Kommer watched J.B. for two weeks in the summer while Jennifer and Daniel worked. Kommer made plans for J.B. to take swimming lessons and go to the library. However, she did not end up getting to do these things with J.B. because Daniel asked the court to modify the parenting time order so that if Jennifer was at work, J.B. went to his home, which did not allow for her to spend time with J.B. Margaret has observed that when J.B. gets to spend a significant amount of one-on-one time with Daniel that she returns to Jennifer in a good mood. When this does not happen, she can return in a foul mood. Margaret has seen J.B. return to Jennifer's home for parenting time where J.B. is unkempt, smelly, and dirty.

¶ 38   Margaret testified that Daniel and Jennifer's relationship has improved since they first separated, but that Jennifer is still sometimes uncomfortable with Daniel. Margaret is aware of some activities that Daniel and Jennifer have participated in together for J.B.'s benefit, and she testified Daniel and Jennifer even sit together at school events on occasion. Both attended J.B.'s birthday party. Margaret testified that she believed

11

Jennifer attempts to appease Daniel to prevent him from getting angry and because it makes J.B. happy when her parents get along.

¶ 39    Margaret then testified that she has been giving Jennifer money to help pay her attorney fees and other expenses such as vehicle repair and rent. She testified that she has paid "probably around $40,000." Jennifer did not sign a promissory note to repay that money but said she would pay Margaret back after the case is settled.

¶ 40    *Eugenia Hunter*

¶ 41    Attorney Eugenia Hunter, who acted as the GAL in this matter, testified at the trial. At the time of trial, Hunter had been an attorney for 42 years, had received training as a GAL, had served as a GAL in more than 100 cases, and has trained other attorneys on how to properly serve as a GAL.

¶ 42    Hunter testified that the most recent version of the Illinois Marriage and Dissolution of Marriage Act (Act) highlights the importance of the involvement of both parents for the health and development of children. It was Hunter's opinion that the current public policy in Illinois is to award equal parenting time where possible.

¶ 43    Hunter testified that throughout the case Daniel consistently stated his preference for equal parenting time. Jennifer consistently requested to have the majority of parenting. Jennifer slightly changed this position just prior to the trial when she indicated she was willing to share some additional time in the summertime with Daniel.

¶ 44    Hunter filed her first report in this case on January 29, 2019, just before the trial began. She testified that her report was fair and balanced. She interviewed all of the parties and various other individuals with relevant knowledge. Hunter met with J.B. five

12

times prior to the trial. Hunter testified that she believed J.B. was truthful with her in their discussions and observed no signs that J.B. had been coached by either parent.

¶ 45   Hunter testified that she considered Dr. Shelton's mental health report and noted that both she and Dr. Shelton reached many of the same conclusions about what was happening with the family and what was best for J.B. Based upon Dr. Shelton's evaluation of J.B., Hunter believed that J.B. might have a slightly stronger attachment to her mother over her father, which she noted was not developmentally unusual. J.B. demonstrated a feeling of safety in both homes with no concerns about having her needs met.

¶ 46   Hunter testified that Dr. Shelton's report noted that Jennifer had concerns that Daniel's "girlfriend" was taking care of J.B. instead of Daniel, but that this allegation was unsubstantiated. Dr. Shelton's report indicated that J.B. was consistent in reporting that Daniel, and not a girlfriend, was the one who provided and cared for her. Hunter testified that J.B. consistently told her the same thing she told Dr. Shelton. It was Hunter's opinion that Jennifer's perception of who cared for J.B. was incorrect because it was contrary to the statements of every other person she spoke with. Hunter also agreed with Dr. Shelton's assessment that J.B.'s previous instances of hesitation when going to her father's was more likely just J.B. mirroring Jennifer's distress at exchanges.

¶ 47   Hunter then testified regarding Jennifer's concerns that farms are dangerous for children. Hunter stated that she made an unannounced visit at Daniel's farm in order to assess the conditions there. She was able to see the machinery and the environment. She testified that the combines were safe. She noted that there are risks in every activity that

13

we do, but she felt that the risks were not exceptionally great at the farm, giving an example of riding in the car being more dangerous. Hunter then went on to reference a portion of Dr. Shelton's report where Dr. Shelton referred to Jennifer's opinion about the dangerousness of a farm as being more of a preference, and ultimately, opined that it was not abusive or neglectful to have a child spend time on a farm.

¶ 48   Hunter testified that J.B. always indicated to her that she was satisfied with the parenting schedule at that time, which was approximately equal parenting time.

¶ 49   Hunter then testified regarding the schools that each parent proposed J.B. attend. Hunter noted that both schools had many positive aspects. She indicated it was difficult to compare schools that are located in different states. She testified that her investigation of Maple Grove Elementary School revealed that it had very good ratings and is small, which could be a positive or negative, and that overall, she was impressed with the school.

¶ 50   Hunter testified that she agreed with Dr. Shelton that a child's preference as to a parent, while an important factor, is not the same as her best interests. She noted that Illinois case law on the weight to be given to a child's preference indicates that an older, more mature, and more reasoned child's preference should carry more weight but considering that J.B. was only seven years old at the time of trial, J.B. lacked the maturity and reasoning sufficient to give great weight to her preference.

¶ 51   Hunter testified that she believed the parties' communication regarding the activities and whereabouts of J.B. had improved during the course of the case and did not believe it posed a significant problem in the future. She agreed with Dr. Shelton's

recommendation of shared parenting time. Hunter also opined that Jennifer and Daniel should share all parenting responsibility, and J.B. should stay in her current school because she was already established there and doing well.

¶ 52 Jennifer's attorney cross-examined Hunter as to the thoroughness of her review of the case, implying that Hunter had not done a thorough job in the particular matter. Specifically, Hunter responded to questions where it was implied she had not properly interviewed all of the witnesses that Jennifer had asked her to or that Jennifer felt had information regarding the matter. Hunter testified the majority of witnesses that Jennifer wanted Hunter to interview or reinterview were witnesses who had information regarding specific instances of bad behavior of one of the parties and to which Hunter already had adequate information to assess those particular situations.

¶ 53 Hunter testified regarding whether her report could be stale due to the fact that many of the interviews occurred a year or two prior to her issuance of the report. Hunter admitted that some portions of the report could possibly be stale but believed this was unlikely because not much had changed from her first entry into the case until her last interview of the parties. Hunter testified that she interviewed J.B. more times than she did in most cases, due to the length of the case. She noted that this particular case had several trial settings and thus several deadlines for her to meet. She could have started her investigation over every time the case was continued, but she had to determine what a productive use of her time would be.

¶ 54 Importantly, after this testimony, but before Hunter finished testifying on a subsequent day of trial, Hunter decided to reinterview J.B., and after doing so, she filed

15

the supplemental February 7, 2020, report. In the supplemental report, Hunter claimed nothing in the most recent conversation with J.B. had changed her mind about her prior recommendations or that the parties should share parenting time equally. Hunter stated that none of the testimony she heard during the trial justified Jennifer's position that she should not share parenting time equally with Daniel. Hunter believed that both Jennifer and Daniel are good parents, despite both of them having some isolated incidents of bad behavior. Hunter stated that Jennifer and Daniel are "equal but different" in that they both are capable of caring for J.B. but are very different people who offer different things to J.B. Hunter believed that this further supported her determination as to why it was important that J.B. spend as much time as possible with both parents. She then reiterated that she believed J.B. should stay in the same school for the time being, with the possibility of making a change when she begins high school, such as a school for gifted children.

¶ 55    *Daniel Burnett*

¶ 56    Daniel Burnett testified that he and Jennifer married in 2008 and they have one daughter together, J.B. Daniel owns two businesses, his farming business and Burnett Trucking, LLC. He testified that he owns nearly 500 acres of farmland which were all purchased prior to his marriage and are nonmarital property. Daniel testified that his personal farm value has grown since its inception in 1997, but no additional land has been acquired since before his marriage to Jennifer. Daniel is an employee of his father's business, Burnett Farms. Daniel does not use any additional time to farm his own land because it is farmed in conjunction with the work done for his father's business. Further,

16

he testified that he is able to conduct the work required for his trucking business during that same time as well. Thus, while he is involved with various businesses, he has been able to work them simultaneously. Daniel explained that his ability to obtain clients and loads for his trucking business is interrelated with his work for his father at Burnett Farms in that while working for the farm he is able to make connections with other farmers, the grain elevator, and people who might need things to be hauled.

¶ 57    In 2009, Daniel needed help running his trucking company. He offered Jennifer a position, but she declined and kept her job with Shawnee Correctional Facility. Daniel then hired Alyssa Driver. With regard to his trucking business, Daniel's testimony was consistent with the testimony of Alyssa Driver.

¶ 58    Daniel testified that he leases the majority of his personal farmland to his father's business, Burnett Farms, which then pays him cash rent of $200 an acre. According to Daniel, this amounts to approximately $80,000 per year, which he uses to pay on his mortgage for the land.[2]

¶ 59    Daniel testified that he earned approximately $37,200 from Burnett Farms, annually as an employee of his father. He also testified that he believed he took $1000 a month for his salary from the trucking company.

_____

[2]Daniel testified at trial that he receives approximately $80,000 annually from his father for the leasing of his farmland. However, this amount differed from that reported on Daniel's 2018 tax return of approximately $104,000. The trial court in its final order used the approximation of $100,000 of rent. The amount of rent is not determinative of the issues before the court; it is instead the characterization of that amount that matters for the determination of the issues raised by Jennifer as analyzed below. For consistency with the trial court's order, we use the $100,000 approximation when referencing the rent amount in the later portions of this disposition.

¶ 60 Daniel's attorney then questioned him regarding a number of financial documents. Petitioner's Exhibit 15 was Daniel's 2018 tax return, showing wages of $58,000, which included his salaries from his father's business and Daniel's trucking company.[3] Daniel also had an IRA account with $81,823 in it, which he testified was partially premarital and partially marital property. The 2018 tax return included a Schedule C filing for the trucking company which reflected business income of $55,971 and a loss of $62,934 for use in Daniel's farm business, for a combined loss of $6260.

¶ 61 Petitioner's Exhibit 16 was a balance sheet of assets and liabilities produced by Daniel's bank and was used to establish Daniel's net worth in conjunction with borrowing money for the businesses as needed. Daniel testified that his net worth just before his marriage to Jennifer was $811,223, which included the marital home. His 493 acres was originally valued at $890,000 at the time of marriage, but the value of that land had increased to $1,030,000 at the time of the trial. The balance sheet most current at the time of trial indicated a net worth of $2,055,739. Daniel introduced the same type of balance sheet document every year since the marriage, except for the years 2009 and 2011.

¶ 62 Petitioner's Group Exhibit 17 included market reports, quotations, tabulations, directories, and other published computation generally relied upon by farming professionals. Daniel testified that the exhibit demonstrated how the profitability of farming had declined from 2013 through 2017. He further testified that the value of his

---

[3]The Petitioner's Exhibit 15 shows that Daniel actually claimed $20,800 in wages from his trucking business in 2018, rather than the $1000 per month to which he testified, described above.

land increased because the price of land increased. It was his opinion that farmland value is not increased by personal efforts, but rather by the market.

¶ 63 Daniel testified next to the insurance policies and retirement accounts that he had. He stated that he was the beneficiary of a life insurance policy on Rollo issued in 1994, with a cash value of $122,000. He also had his Northwestern Mutual retirement account, part of which he admitted would be marital property, as well as his Roth IRA, also partly marital.

¶ 64 Daniel testified that some items, including a marital Polaris Razor 800S, were stolen from the farm and the insurance company rejected the claim. He testified that Jennifer's premarital ATV was still at the farm.

¶ 65 Daniel testified that he had paid between $40,000 and $50,000 to his attorneys for their representation in this case.

¶ 66 Daniel testified that he believed that he and Jennifer should continue to split parenting time of J.B. evenly as they had been doing for so long and as recommended by Dr. Shelton and GAL Hunter. Daniel disagreed with Jennifer being awarded sole decision-making responsibility regarding education, especially in light of the fact that they had been sharing this responsibility for J.B.'s entire life. He testified that his family highly values education and J.B. was doing well at Maple Grove. He also emphasized that J.B.'s friends attended Maple Grove and J.B. fit in well there. Daniel then expressed concerns regarding J.B. being transferred to a large school due to J.B.'s shy nature. He testified that Maple Grove offers basketball, volleyball, track, and sometimes softball if there are enough students to play. The grade school academics are the same at Maple

Grove school as that offered by all grade schools in Illinois plus an accelerated reading and math program, and the local high school offers gifted programs, Future Farmers of America program, and college credit classes through Shawnee College. Daniel then touched on Massac County schools and indicated that they probably offered more for students than Maple Grove. Daniel testified that should it be necessary to send J.B. to a school that offers more sometime in the future, he would be willing to pay to do so as long as it would truly benefit J.B. But he also noted it was important to keep her close to where she has family support. Daniel expressed concern about sending J.B. to a school out of state because there would be less family support. He testified that Jennifer works 45 minutes from Paducah, Kentucky, so if J.B. were to become ill, there would be no one near to pick her up. However, if J.B. stayed where she currently is, he is within five minutes of her if she needs him, as is the rest of his family.

¶ 67    *Jennifer Burnett*

¶ 68    Jennifer first testified regarding her wishes for the allocation of parenting time between her and Daniel. She acknowledged that both GAL Hunter and Dr. Shelton recommended parenting time continue to be split evenly as it was allotted in the temporary order. Jennifer explained that her opinion differed from Dr. Shelton and GAL Hunter because during the school year, J.B. would come home tired and sometimes did not have her homework done. Jennifer pointed to a recent grade drop where J.B. received a grade of "B" instead of an "A" in math. Jennifer stated that she believed a schedule where J.B. was with her during the week while school was in session was best, but she also admitted that under the current schedule with an even split that J.B. had done well.

20

According to Jennifer, other than J.B.'s math grade, she did not appear to be suffering from the shared schedule.

¶ 69   Jennifer testified that her work schedule had changed from a 7 a.m. to 8 a.m. start time, and she would be allowed to use flex time to take J.B. to school in Paducah, Kentucky, then report to Vienna, Illinois, for work. She could then work until 4:15 p.m. or 4:30 p.m. and would rely on an after-school program to care for J.B. until Jennifer could return to retrieve J.B. after her workday.

¶ 70   Jennifer testified that she did not believe that Daniel actually spent time with J.B. during his parenting time, but admitted she had no direct evidence this was true.

¶ 71   Jennifer testified that she wanted to be awarded sole parenting time so she could relocate to Paducah, Kentucky. Following the couple's separation, Jennifer had moved from Massac County to Paducah and then back to Massac County. Jennifer testified that recently she and Daniel had been getting along very well. They had taken J.B. to a movie and dinner together, and Daniel had allowed Jennifer to take J.B. to a Christmas event during his parenting time. They both took J.B. to get her ears pierced and got along well during Girl Scout events. Jennifer acknowledged that she had never advised the court that she and Daniel were not getting along, even when asked at various hearings. She stated that she believed their relationship could be better, but that their relationship at the time of trial was better than in 2015, 2016, and 2017, when he did not always tell her everything he did with J.B. Jennifer testified that she had been afraid of Daniel in the past, but it had been at least two years since Daniel had demonstrated any aggression toward her.

¶ 72    Jennifer expressed concern that in the past Daniel had not informed her of all of J.B.'s activities. She testified that once Daniel enrolled J.B. in the Sylvan Learning Center without first consulting her. When asked whether taking J.B. to Sylvan helped her, Jennifer responded "if you say so." Jennifer then acknowledged that the school advised her that enrolling J.B. with Sylvan was the right thing to do.

¶ 73    Another instance of miscommunication Jennifer referred to was a time that Daniel scheduled a medical appointment for J.B. at Vanderbilt University in 2017 without first consulting her. Daniel did consult Jennifer prior to attending the actual appointment but failed to do so before he scheduled the appointment. Jennifer then went on to note additional miscommunications or Daniel's failure to involve Jennifer in decision-making.

¶ 74    Jennifer testified that in the past there had been times where J.B. did not wish to go with her father. During some of the exchanges J.B. physically resisted going with Daniel initially, before changing her mind. Jennifer testified that J.B. sometimes still resists going with Daniel, but she can now verbally express this, where she had difficulty doing so before. When this occurs, Jennifer encourages J.B. to go with Daniel. Jennifer testified that there are occasions when J.B. comes back from Daniel's parenting time and her homework is not completed, and she has not bathed. Jennifer relayed concerns about who is caring for J.B., or helping her with her homework, or giving her a bath. Jennifer also testified that she has concerns regarding the dangers that are present relating to farming and farm equipment at Daniel's residence.

¶ 75    Jennifer testified to having concerns about J.B. being exposed to the various women in Daniel's life. While she testified that Daniel's girlfriend at the time of trial,

Sarah Wittig, is a good role model and was J.B.'s former art teacher, she believes that J.B. is confused about Alyssa's role in Daniel's life.

¶ 76    Jennifer testified that Daniel has not provided any child support to her, and that he has only paid for one medical visit and a couple of J.B.'s eyeglasses.

¶ 77    Jennifer testified regarding a video she posted in the past on Facebook of J.B. crying about having to go to her dad's house. She indicated that type of behavior happened regularly. She admitted to regretting making the post online.

¶ 78    Jennifer testified about a time that she inquired about Daniel's whereabouts at the request of J.B. when Daniel was out of town. Daniel replied that he was on a business trip, but he was actually vacationing in Mexico. Jennifer then admitted to posting again on Facebook, commenting that Daniel did not pay child support or buy school supplies for J.B. but could afford to go to Mexico. The post referenced Daniel's "whore" and called him a "piece of shit" who should rot in hell. The post included a photo of J.B. and was admitted as Petitioner's Exhibit 24 at trial. Jennifer then testified that she told J.B. that Daniel was on vacation because she believed J.B. should know that Daniel was a liar.

¶ 79    Jennifer next testified to her plans to move to Paducah, Kentucky, and send J.B. to school in the Heath school district. Jennifer stated that she was looking for a home in that school district near her mother's residence. The area is approximately 20 miles from Daniel's home. Jennifer expressed concerns about Maple Grove and its lack of opportunities. Jennifer did acknowledge that J.B. is doing well in school at Maple Grove, but that she has concerns that this would not continue because Daniel does not provide appropriate structure or assistance to J.B.

23

¶ 80    Jennifer next testified regarding how much Daniel worked when they were living together. She stated that at the beginning of the marriage, he worked seven days a week for 12 to 16 hours at a time. After J.B. was born, Daniel worked less, often coming home by 9 p.m. She testified that she asked him to hire more help so he could be at home more. Jennifer worked at this time at the Department of Corrections and took care of J.B. and the home.

¶ 81    Jennifer testified that she only spoke with GAL Hunter on two or three occasions in the beginning of the case. Jennifer testified that she is not comfortable with Hunter. She emailed and called Hunter frequently in the beginning of the case, but Hunter never saw an issue with Jennifer's concerns, so she stopped bothering to tell her anything else. Jennifer disagreed with Hunter's report and recommendations.

¶ 82    Jennifer testified about her financials and identified her 2018 tax return, which was marked Petitioner's Exhibit 2. That document showed Jennifer earned wages of $43,000 in 2018. However, for that same year the Comptroller of the State of Illinois report indicated that she earned $50,981.81. Jennifer could not explain the discrepancy but affirmed that she was paid as indicated by the comptroller's report. Jennifer acknowledged that she had entered into a stipulation that the home she and Daniel built on land owned by Daniel's family was worth $240,000.

¶ 83    Jennifer then testified regarding her attorney fees. Jennifer testified that she owed $2,392.58 to Michelle Shaefer's law office for legal fees from representation earlier in the litigation. Jennifer testified that she paid $4803 to GAL Hunter and borrowed the remainder of the GAL fees from her mother, Margaret. Her mother also helped her with

24

other expenses such as school clothes and rent for J.B. There was no formal promissory note memorializing these payments, but Jennifer affirmed her intent to repay her mother.

¶ 84    Jennifer then testified that she had paid $2500 toward her current attorney fees and that Daniel had also paid $4500 toward those as well. Respondent's Exhibit 9 was GAL Hunter's bill, which Jennifer believed had been kept current. Jennifer testified that she had worked for the Department of Corrections for 21 years and had no additional training to work another job. Jennifer testified that she believes she was financially worse off at the time of trial than she was prior to the marriage. She testified that she was struggling financially at the time of her testimony.

¶ 85    On the next to last day of trial, Daniel filed a motion to have Jennifer prohibited from making further negative social media posts about him and attached exhibits of example posts. The motion was ultimately granted. Jennifer filed a petition for contribution to attorney fees and costs, alleging that she had unpaid attorney fees of more than $75,000, with additional fees anticipated.

¶ 86    Following the end of testimony at trial, the parties submitted simultaneous written closing arguments. Daniel requested that the court order the parties to share parenting responsibility and award equal parenting time; asked that the parties split the value of the marital home, and that it be awarded to him; that the parties each be awarded their nonmarital property and keep other property already in their possession; that the request for maintenance be denied; that child support in the amount of $132 per month be awarded to Jennifer, and that Jennifer's request for further contribution to attorney fees be denied.

¶ 87    Jennifer requested child support but did not offer the court a calculated amount. Instead, Jennifer requested that the trial court order Daniel to pay child support and advised the court to calculate the amount as follows: actual income as reflected on Daniel's tax return, plus the amount of cash rent Daniel receives for his farmland, plus the amount of depreciation he claims for his business interests. She further asked that the court order child support retroactively. She asked to be allowed to claim J.B. on her taxes every year and that Daniel pay either all or half of J.B.'s medical copays and costs for extracurricular activities. She requested the court award and calculate maintenance similarly to that as outlined for child support. Jennifer further asked the court to find that Daniel's personal efforts during the marriage increased the value of his nonmarital holdings, such that the marital estate is required to be reimbursed for those efforts. Jennifer argued she was entitled to share equally in the increase in Daniel's net worth minus the $240,000 for the marital home, which was $1,685,485, as it was determined four months before the petition for dissolution was filed, or $1,244,536, as demonstrated in April 2019, during presentation of evidence at trial. She asked that she be granted more than an equal division of marital property, including the entire value of the marital home. She asked that Daniel be ordered to contribute an amount equal to all of her attorney fees. Finally, she requested that the court allow the parties to keep their respective retirement accounts or for her to keep the entirety of her retirement account and for Daniel's account also to be awarded for her as compensation for reimbursement to the marital estate. Both parties, in turn, responded to the other's argument.

¶ 88 On July 16, 2020, the trial court issued its initial decision in letter form with instructions for the proposed final orders to be amended to reflect his decisions. Judge Williamson was critical of the quality of both parties' attorney's work product throughout the case, especially as it related to the parties' closing arguments and proposed final orders where the court specifically discussed Jennifer's attorney's failure to proofread her filed documents. The trial court was further critical of the delays in the litigation which resulted in five years passing before the case was able to finally be tried. The trial court instructed Daniel's counsel to redraft the proposed orders in accordance with the court's findings and recommendations within his July 16, 2020, correspondence.

¶ 89 Following corrections to the proposed orders, the trial court entered them on September 11, 2020. In its judgment of allocation of parental responsibilities the trial court noted that

> "this cause came on for final hearing before this Court, during which time testimony was presented, evidence was adduced, arguments of counsel were presented, stipulations were made, the Report and Supplemental Report of the Guardian *ad Litem*, Eugenia Hunter, was presented and admitted, and the Report of the Court's professional, psychologist Dr. Sarah Shelton, was presented and admitted."

The court further noted that its decision was made while "being fully familiar with all competent and relevant matters of record and having reviewed and being fully aware of and having considered all relevant statutory and other factors pertaining to child custody."

27

¶ 90    In the order, the trial court found that it was in the best interests of J.B. to order an allocation of equal parenting time for both parties. The court also indicated that both parties would share all decision-making, including that relating to education, but that J.B. would continue to attend school at Maple Grove school unless agreed to otherwise by the parties. Daniel's residence would serve as the designated residential residence of J.B. for the purposes of school enrollment and registration.

¶ 91    The trial court also entered its amended allocation for dissolution of marriage. The court began this order by reiterating it had considered all the evidence both documentary and testimonial and had considered all relevant law and statutory factors. The trial court found that it was established by a preponderance of the evidence that irreconcilable differences existed for grounds to grant a judgment of dissolution of marriage. The court noted that the parties had agreed that the fair market value of their home was $240,000. Pursuant to that stipulation, the trial court awarded the home to Daniel Burnett and directed Daniel to compensate Jennifer for her interest in the home through a payment of $120,000. The court then held that the remaining marital property, consisting of household furniture, furnishings, and appliances, was awarded to the party who had possession of those items. Further, regarding bank or depository accounts and vehicles, each party was awarded the property titled to and in the possession of each.

¶ 92    The trial court then addressed the retirement accounts of Daniel, of which portions were marital property. The court divided both accounts equally among the parties as stipulated to by Daniel.

¶ 93    Regarding child support, the court found Daniel was obligated to pay child support in the amount of $84 per month and health insurance of $73 per month, totaling $157 per month. Regarding maintenance payments which were requested by Jennifer, the trial court denied her request and awarded no maintenance.

¶ 94    The court then identified Jennifer's nonmarital property, which consisted of real property located on Tick Ridge Road, Pulaski County, and a Honda ATV.

¶ 95    Jennifer had a State Employees' Retirement System benefit. The court noted that this retirement account had both nonmarital and marital aspects. The court noted that the marriage only lasted for seven years and considering that short duration and the value of the benefit, the court awarded Jennifer the entire amount.

¶ 96    Daniel Burnett had some nonmarital real property which was awarded to him and the court also awarded Daniel a nonmarital property Country Companies paid-up life insurance policy, which was for the life of his father, Rollo, the cash value of which was $122,055.

¶ 97    The court then turned to the issue of reimbursement to the marital estate of the increase in value to Daniel's nonmarital business enterprises due to his personal efforts. Jennifer claimed that her work in the home allowed Daniel to put forth these efforts and that the estate had not properly been compensated for this activity. The trial court referenced section 503(c)(2)(B) of the Act (750 ILCS 5/503(c)(2)(B) (West 2018)), which states in relevant part:

"When a spouse contributes personal effort to non-marital property, it shall be deemed a contribution from the marital estate, which shall receive reimbursement

29

for the efforts if the efforts are significant and result in substantial appreciation to the non-marital property except that if the marital estate reasonably has been compensated for his or her efforts, it shall not be deemed a contribution to the marital estate and there shall be no reimbursement to the marital estate."

¶ 98 Daniel had two businesses which he contributed personal efforts, Burnett Trucking, LLC, and Daniel Burnett Farms. The court first examined Burnett Trucking, LLC. The court found that Daniel was paid a gross annual salary of $20,800 as an employee of this company. The court found that this amount represented "fair and reasonable compensation for his efforts," and, the marital estate had been compensated for those personal efforts, and thus, determined that no reimbursement from Daniel was required regarding the trucking business. The court then examined the farm business, where Daniel rented 500 acres of land which he owned previous to the marriage to his father's farming business. The court acknowledged Daniel's testimony that the farmland was at that time worth $1.3 million, which was an increase from the value in 2008 of $890,000. The court found that the evidence demonstrated that the price of farmland had increased since its purchase due to the market, but that Daniel had also "expended significant efforts to maintain and improve this farmland," which resulted in "substantial appreciation to this farmland." Annually, Daniel received $100,000 cash rent for the use of the farmland, and this amount was expended solely on the farmland mortgage, expenses, and improvements. The court found there was no contribution to the marital estate from this money and then determined that proper compensation for his work on his farming business would have been commensurate with his trucking company. Therefore,

the court found that a proper compensation amount of $20,800 annually, the same as that for the trucking company compensation, was appropriate and calculated a reimbursement of $10,400 per year (one-half of $20,800) over the length of the marriage, which was seven years, totaling $72,800.

¶ 99 Regarding Jennifer's request for contribution from Daniel for her attorney fees and costs, the court awarded $5500 in addition to the $4500 which Daniel had already paid earlier in the litigation. Notably, in the amended judgment for dissolution of marriage, when determining whether to award attorney fees as requested by Jennifer, the trial court stated that it had "considered all relevant factors including the criteria for division of marital property, the ability of each party to pay their own bills, their financial resources, the cost[-]conscious approach of each party to litigation, and any unnecessary increase in the cost of litigation."

¶ 100 The trial court's order of support is the worksheet in which the trial court calculated the amount of child support it awarded.

¶ 101 Following the entry of those orders, this timely appeal followed.

¶ 102                                    ANALYSIS

¶ 103 Jennifer raises the following issues: (1) whether the trial court's ruling was against the manifest weight of the evidence when it allocated equal parenting time and established Daniel as the primary residential custodian; (2) whether the trial court's reliance on the mental health report and the investigation by the guardian *ad litem* to aid in its determination of the best interests of the child was an abuse of discretion; (3) whether the trial court erred in its child support calculation and in denying Jennifer's

request for retroactive child support; (4) whether the trial court's finding that the marital estate was adequately compensated for Daniel's personal efforts in his trucking company was against the manifest weight of the evidence; (5) whether the amount of reimbursement Daniel was ordered to make to the marital estate for his personal efforts relating to his farming business was against the manifest weight of the evidence; (6) whether the trial court abused its discretion when it divided the marital estate; and (7) whether the trial court's award of attorney fees was an abuse of discretion. We address each issue below in turn.

¶ 104 (1) Whether the trial court's ruling was against the manifest weight of the evidence when it allocated equal parenting time and established Daniel as the primary residential custodian.

¶ 105 Jennifer on appeal raises the issue as to whether the trial court erred in its determination regarding the allocation of parenting time between the parties. Specifically, Jennifer claims that the trial court erred when it determined that it was in the best interests of J.B. that the parties split parenting time equally, share in all of the decision-making responsibilities, and determined that Daniel would have primary residential custody for the purposes of registering for school so that J.B. could continue attending school in Massac County instead of awarding the majority of parenting time, decision-making, and primary residential custody to Jennifer.

¶ 106 "Section 602.7 of the Act requires a court to allocate parenting time in accordance with the best interest of the child." *In re Marriage of Whitehead*, 2018 IL App (5th) 170380, ¶ 14. The circuit court in determining the best interests of the child for purposes of allocating parenting time must consider all relevant factors, including, without

32

limitation, those listed in section 602.7(b). Section 602.7(b) lists the following nonexclusive factors:

"(1) the wishes of each parent seeking parenting time;

(2) the wishes of the child, taking into account the child's maturity and ability to express reasoned and independent preferences as to parenting time;

(3) the amount of time each parent spent performing caretaking functions with respect to the child in the 24 months preceding the filing of any petition for allocation of parental responsibilities or, if the child is under 2 years of age, since the child's birth;

(4) any prior agreement or course of conduct between the parents relating to caretaking functions with respect to the child;

(5) the interaction and interrelationship of the child with his or her parents and siblings and with any other person who may significantly affect the child's best interests;

(6) the child's adjustment to his or her home, school, and community;

(7) the mental and physical health of all individuals involved;

(8) the child's needs;

(9) the distance between the parents' residences, the cost and difficulty of transporting the child, each parent's and the child's daily schedules, and the ability of the parents to cooperate in the arrangement;

(10) whether a restriction on parenting time is appropriate;

33

(11) the physical violence or threat of physical violence by the child's parent directed against the child or other member of the child's household;

(12) the willingness and ability of each parent to place the needs of the child ahead of his or her own needs;

(13) the willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child;

(14) the occurrence of abuse against the child or other member of the child's household;

(15) whether one of the parents is a convicted sex offender or lives with a convicted sex offender and, if so, the exact nature of the offense and what if any treatment the offender has successfully participated in; the parties are entitled to a hearing on the issues raised in this paragraph (15);

(16) the terms of a parent's military family-care plan that a parent must complete before deployment if a parent is a member of the United States Armed Forces who is being deployed; and

(17) any other factor that the court expressly finds to be relevant." 750 ILCS 5/602.7(b) (West 2018).

¶ 107 "Because the trial court is in the best position to assess the credibility of witnesses and determine the child's best interests, its decision regarding the allocation of parenting time must be accorded great deference." *In re Marriage of Whitehead*, 2018 IL App (5th) 170380, ¶ 15. A reviewing court "will not overturn the trial court's decision unless the court abused its considerable discretion or its decision is against the manifest weight of

the evidence." *Id*. "A judgment is against the manifest weight of the evidence only if an opposite conclusion is apparent or if the findings appear unreasonable, arbitrary, or not based on the evidence." *Id*. ¶ 21.

¶ 108 The court in its July 16, 2020, letter indicating its intention to rule in favor of Daniel made the following statement:

> "This Court has considered the evidence, testimonial and documentary, including the evidence and report of Guardian *Ad Litem* Eugenia Hunter, the report of the psychologist, Dr. Sarah Shelton, the written arguments of counsel, and the statutory and case law applicable herein."

¶ 109 That letter further directed Daniel's counsel to revise the judgment of allocation of parental responsibilities that he proposed to reflect those edits made by the trial court. The revised and official judgment of allocation of parental responsibilities was filed on September 11, 2020. The trial court in that document stated its decision was made "being fully familiar with all competent and relevant matters of record and having reviewed and being fully aware of and having considered all relevant statutory and other factors pertaining to child custody."

¶ 110 Jennifer argues that the court

> "either did not consider or improperly weighed the following factors: the wishes of the child, the child's adjustment, ability of the parents to cooperate, level of each parent's past decision-making, prior course of conduct relating to decision-making, the child's needs, the parents' proximity and daily schedules, and the

35

willingness of each parent to cooperate and facilitate a relationship between the child and other parent."

Jennifer then claims that the remaining factors are irrelevant or weighed evenly in favor of each parent.

¶ 111 As to the claim that the trial court failed to consider the best interest factors, or failed to consider certain factors, we disagree, and Jennifer offers no evidence to support this claim. The trial court in its order awarding equal parenting time states specifically that its decision was reached "having reviewed and being fully aware of and having considered all relevant statutory and other factors pertaining to child custody." "Although a trial court must consider all relevant factors when determining the best interests of a child, it is not required to make an explicit finding or reference to each factor." *In re Custody of G.L.*, 2017 IL App (1st) 163171, ¶ 43. "Generally, we presume that a trial court knows the law and follows it accordingly." *Id.* "A petitioner's mere assertion that the trial court did not consider the statutory factors is insufficient to overcome the presumption that the trial court knew and followed the law." *In re Marriage of Whitehead*, 2018 IL App (5th) 170380, ¶ 16. Thus, this claim by Jennifer is without merit.

¶ 112 We turn to the claim that the trial court "improperly weighed" the factors. This issue is not properly framed as it attempts to ask this court to reweigh the factors. However, an appellate court's review of the allocation of parenting time is not conducted *de novo*, but instead is conducted with the intent to determine if the trial court's determination was against the manifest weight of the evidence. Thus, we reframe the

question to one that is proper on appeal: whether the trial court allocated parenting time in a manner that is against the manifest weight of the evidence when it determined the best interest of the child. Jennifer contends in her briefs that when the facts of this case are analyzed in light of all of the factors of section 602.7(b) it is clearly apparent the trial court's order which granted equal parenting time is not in the best interest of J.B. We disagree.

"A trial court's findings as to a child's best interest are entitled to great deference because the trial judge is in a better position than we are to observe the personalities and temperaments of the parties and assess the credibility of the witnesses. [Citation.] 'It is a well-established rule that the credibility of witnesses should be left to the trier of fact because it alone is in the position to see the witnesses, observe their demeanor, and assess the relative credibility of witnesses where there is conflicting testimony on issues of fact.' [Citation.] We will overturn such a determination only if it is against the manifest weight of the evidence, is manifestly unjust, or is the result of an abuse of discretion. [Citation.] A judgment is against the manifest weight of the evidence only if an opposite conclusion is apparent or if the findings appear unreasonable, arbitrary, or not based on the evidence." *In re Marriage of Whitehead*, 2018 IL App (5th) 170380, ¶ 21.

¶ 113 As previously noted, Jennifer points to eight specific factors which she believes weigh in her favor and which she feels the trial court must have failed to properly consider. We quickly discuss those factors and the testimony and facts relevant to those factors below to determine whether the trial court's allocation of equal parenting time

was against the manifest weight of the evidence. For the sake of brevity, we do not discuss in full the remaining factors as Jennifer alleges in her brief that they are either not relevant or weigh equally in favor of both parties.

¶ 114 Contrary to petitioner's assertions, when the facts of this case are analyzed in light of the factors set forth in section 602.7(b) of the Act, it is not clearly apparent that the trial court's order as to the parenting time schedule is not in the best interest of the minor child, J.B. Here, the first factor, the wishes of each parent, does not favor either parent and thus does not weigh against an allocation of equal parenting time. Daniel has maintained throughout the entire litigation that he wants an even split of parenting time between him and Jennifer. Jennifer, however, has maintained throughout the litigation that she wants the majority of parenting time and that she wants sole decision-making responsibility for J.B. Over time, Jennifer's position has somewhat softened so that just prior to trial she agreed to an even split of parenting time during the summer months, but Daniel only gets parenting time every other weekend and Wednesdays overnight during the school year, in addition to the holidays and vacation time they agreed on. A reasonable trier of fact could find that this factor slightly weighs in favor of equal parenting time because Daniel has been willing to split parenting time from the outset and appears to be attempting to be cooperative and place the best interest of the child in front of his or her own interest.

¶ 115 The second factor is the wishes or wants of the child. The testimony elicited at trial indicated that J.B. has a slight preference for Jennifer. There was testimony that J.B. often stayed close to Jennifer or held Jennifer's hand whenever she was around. Also,

38

there was testimony that one time while at school J.B. began missing Jennifer and her teacher emailed Jennifer to help calm J.B. However, there was also testimony from nearly all the witnesses that J.B. loved her father and enjoyed spending time with him. Dr. Shelton's report also acknowledged that J.B. had a slight preference for her mother but stressed that J.B. "does not express a preference *not* to be with her father. In fact, there was nothing to indicate a negative or aversive belief, attitude, or feeling toward her father." (Emphasis in original.) GAL Hunter also echoed Dr. Shelton's assessment in her testimony stating that it was not developmentally unusual for a child to have a slight preference for her mother at such a young age. However, it is well established that when considering this factor, the court must also look to the age and maturity of the child. The wishes of the children should not be given too much emphasis when the child is very young or immature. Here, J.B. was only seven at the time of the trial and even younger during the interviews that took place with Dr. Shelton prior. Thus, this factor does not weigh against an allocation of equal parenting time.

¶ 116 The third factor is the amount of time each parent spent performing caretaking functions with respect to the children in the 24 months preceding the filing of the petition for allocation of parental responsibilities. The testimony at trial did indicate that prior to their separation Jennifer did most of the caretaking of J.B. This was primarily because Daniel worked later into the day on the farm. When we examine the record and testimony as it relates to how the parents handled caring for J.B. after their separation when Jennifer and Daniel had a split parenting-time arrangement during the litigation, the testimony suggests that each parent took care of J.B. while she was in his or her care. Jennifer

testified at trial that when J.B. was in the care of Daniel that she was returned dirty, tired, and without her homework done. This testimony was refuted by Daniel and his family. Additionally, the GAL stated she could not substantiate these claims. Thus, there is testimony that during the marriage Jennifer primarily handled the caretaking responsibilities, but after the separation both parents began caring for J.B. equally. While typically the court would look at the preceding 24-month period prior to the filing of the petition for allocation of parenting time as the rule states, in a case such as the present where the length of the litigation was incredibility long (nearly five years), the court could also have considered the caretaking as it occurred during those five years of litigation. Ultimately, this factor does not weigh against an allocation of equal parenting time because the evidence clearly establishes that both parents are capable and willing to undertake the caretaking functions required for J.B.

¶ 117 With regard to the fifth factor, the interaction and interrelationship of the child with his or her parents and siblings and with any other person who may significantly affect the child's best interests, this factor does not weigh against an allocation of equal parenting time. As previously stated, the evidence is clear that J.B. loves both parents. There was testimony that J.B. was close with her half-sister, Alexis Burnett, who attends college. They sometimes travel and go on trips together and Alexis will take J.B. for ice cream. Further, J.B. is close with Daniel's parents and her cousins on the Burnett side of the family who she occasionally gets to visit and play with during the week. The testimony also suggests that J.B. has close relationship with Jennifer's mother, Margaret. Therefore, this factor does not substantially favor one parent over the other, although it is

beneficial for J.B. to have significant time to spend with her half-sister when she is home from college and her cousins who are near her age.

¶ 118 As to the eighth factor, the child's needs, the record does not reflect any special needs on the part of J.B. As noted by the psychologist in her report, J.B. is a normal and well-adjusted child. It appears all J.B.'s needs are being met. Thus, this factor does not weigh against an allocation of equal parenting time.

¶ 119 Curiously, under the eighth factor, Jennifer attempts to argue that J.B. requires attendance at a larger school with more opportunities so that she can become a veterinarian. This is not the type of "need" that is intended to be argued under this factor. Even if it was, we do not find this argument persuasive. J.B. was seven years old at the time of trial, and while this court surely wishes her the best in her endeavor to become a veterinarian if she so chooses, she may also change career paths prior to her graduation of high school or beyond. Even if she does not, there was no testimony that Heath school offered a special veterinarian program for seven-year-old children. This court is not convinced that one school so clearly would prepare an individual for a career path better than the other as discussed in more detail below. On the other hand, this court does note that there was testimony that J.B. loved to spend time on the farm where she could visit and play with various animals. It is entirely possible that J.B.'s ability to spend time on a farm where she can regularly interact with various types of animals and pets would be beneficial in continuing to foster her passion for animals.

¶ 120 With regard to the ninth issue, the distance between the parents' residences, the cost and difficulty of transporting the child, each parent's and the child's daily schedules,

and the ability of the parents to cooperate in the arrangement, it does not appear that this factor favors one party over the other. As previously discussed, the parties' residences are within relatively close proximity. At the time of trial, Daniel and Jennifer were living in Massac County, although the testimony made it clear that Jennifer had intentions of moving to Kentucky. However, this would only result in her being 30 to 45 minutes away. Thus, there is no real issue as to the costs of travel for the parties when it is time for the other parent's parenting time, nor was there any testimony that once an arrangement is in place that either party does not follow the arrangement. The true focus of this factor would be the compatibility of each parent's schedules with that of J.B.'s schedule.

¶ 121   Jennifer testified that her work schedule could be set up in a way that would nearly mimic J.B.'s school schedule. Jennifer testified that she could use a "flex schedule" at work to make her shift at the Shawnee Correctional Center from 8 a.m. to 4 p.m. Monday through Friday. Jennifer testified that as a part of her job she has sick days, personal days, and holidays, which would allow for some flexibility should J.B. require her attention or an emergency arise.

¶ 122   The nature of Daniel's schedule is disputed. Jennifer claims that Daniel "works three jobs, 7 days a week, for an average of 20 hours per day." However, Jennifer is the only individual from which this version of Daniel's schedule arises. Daniel, Daniel's family, and Alyssa Driver all testify that Daniel is able to adjust his work schedule when he has parenting time with J.B. so that he can drop her off at school and get off work earlier so that he can be with her after school. Obviously, the ability of Daniel to adjust

42

his schedule is further aided by the fact that he is self-employed and has his family living in the immediate area to help out should J.B. require attention when he is working.

¶ 123 While it appears that both parents likely could drop J.B. off at school, neither would likely be able to pick her up from school. Jennifer is not off work until 4 p.m. and works in Vienna. She testified that if the trial court ruled in her favor, J.B. would attend Heath school in Paducah, Kentucky, and Jennifer would utilize an after-school program to care for J.B. until she was able to get off work and travel to pick her up. On the other hand, Daniel may be still working, depending on the time of year. What is clear is that while both parties have had shared parenting time, the evidence at trial suggests that J.B. is dropped off to school on time, picked up on time, and that each parent is able to make sure she is either being cared for by them, or, if they are unable, by a trusted family member. Thus, this factor does not weigh against an allocation of equal parenting time.

¶ 124 As to the twelfth factor, the willingness and ability of each parent to place the needs of the child ahead of his or her own needs, Jennifer claims that this factor weighs in her favor because she has remained single following her separation from Daniel and because she attempts to avoid confrontation. She further argues that because Daniel has had relationships with multiple women following their separation that this is evidence that he is not willing to put J.B.'s interests ahead of his. We disagree. While the evidence does demonstrate that Daniel has a girlfriend and has been involved with other women following his separation from Jennifer, this is not necessarily germane to a court's determination of the best interests of the child. "Parental conduct that does not adversely affect the child is not to be considered in the custody determination." *In re Marriage of*

*Stone*, 164 Ill. App. 3d 1046, 1053 (1987). Thus, evidence of a parent's relationship or intimacy with another individual may be deemed insignificant if there is no indication that the child's welfare is endangered. *Id.* There simply is no evidentiary support for Jennifer's argument that J.B. has been confused or harmed by Daniel's other relationships. In fact, Jennifer herself testified at the trial that Daniel's girlfriend at that time was a woman who was a good role model for J.B. Dr. Shelton in her report stated that J.B. reported "positive feelings and attitudes about [Alyssa Driver]" and GAL Hunter's testimony reiterated these same perceptions. Further, both Dr. Shelton and Hunter recommended a 50/50 split of parenting time, believing that both parents were capable and willing to forgo their own interests to take care of J.B. Daniel's testimony, combined with his family's, and Ms. Driver's, indicated that Daniel regularly adjusted his schedule to be with J.B. when she was in his care and that he attended her school and girl scout events. Thus, this factor does not weigh against an allocation of equal parenting time.

¶ 125 With regard to the thirteenth factor, the willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child, Jennifer contends this factor favors an award of the majority of parenting time to her. However, she offers no relevant facts or evidence to support this contention. In her brief, Jennifer merely contends that Daniel's wish to keep J.B. at Maple Grove and his busy schedule demonstrate he does not facilitate J.B.'s and Jennifer's relationship. We do not find these particular facts relevant to this factor. Throughout the testimony at trial, there was no testimony that either parent actively worked to prevent J.B. from seeing the

other parent or worked to diminish or impact the relationship between J.B. and the other parent. There was testimony by both parents of instances where the parent spoke in a less-than-flattering manner regarding the other parent in front of the child and in some cases publicly. There was testimony regarding an exchange of J.B. which resulted in an altercation towards the beginning of the litigation. However, all of the evidence in the more recent years preceding the trial indicated that both Jennifer and Daniel were able to maintain a somewhat amicable relationship and were cooperating for J.B.'s sake. Jennifer herself testified that she and Daniel had been getting along very well. They had taken J.B. to a movie and dinner together, and Daniel had allowed Jennifer to take J.B. to a Christmas event during his parenting time. Apparently, Jennifer and Daniel were able to take J.B. to do certain activities like getting her ears pierced and Girl Scout events while getting along. Both Dr. Shelton and GAL Hunter testified that the parties had difficulties getting along at the beginning of the litigation, but that their relationship had improved immensely towards one another by the time of trial. Thus, this factor also does not weigh against an allocation of equal parenting time.

¶ 126　Therefore, after reviewing the eight factors that Jennifer claims so strongly support her position that the court erred in allocating equal parenting time between Daniel and her, we state again that we disagree. The evidence in this case does not suggest that the trial court acted arbitrarily, or that no other person would have taken the same position that the court did. In fact, both Dr. Shelton, the reviewing psychologist, and GAL Hunter advocated for the same outcome of equal parenting time. Thus, the trial court's decision was not against the manifest weight of the evidence.

¶ 127 We further note that some of the other remaining best interest factors, which Jennifer claimed were not relevant or evenly weighed, could have also been found to favor an allocation of equal parenting time. The fourth factor, any prior agreement or course of conduct between the parents relating to caretaking functions with respect to the children, and the sixth factor, the child's adjustment to his or her home, school, and community, support the finding that because J.B. was used to the split arrangement, which had been the norm over the five years preceding the trial, and the fact that she was established in the Maple Grove school and Massac County area, these two factors weighed in favor of awarding equal parenting time and also keeping J.B. in the environment and location she was accustomed to.

¶ 128 We do acknowledge that some of the evidence at trial was disputed with differing versions of facts given by the parties. As to the issues regarding conflicting testimony and evidence, "[a reviewing court] will not second guess the trial judge's determinations regarding credibility of witnesses." *In re Marriage of Petraitis*, 263 Ill. App. 3d 1022, 1035 (1993). Further, "[i]t is not the function of this court to reweigh the evidence or assess the credibility of testimony and set aside the trial court's determination merely because a different conclusion could have been drawn from the evidence." *In re Marriage of Pfeiffer*, 237 Ill. App. 3d 510, 513 (1992). Thus, the circuit court, having considered the statutory factors in light of the evidence presented and having possessed a superior vantage point for evaluating the temperaments, personalities, capabilities, and credibility of Jennifer and Daniel, decided that it was in the best interests of J.B. to have

46

an equal amount of parenting time with both parents. Considering all the above, the circuit court's decision was not against the manifest weight of the evidence.

¶ 129 We now address Jennifer's claim that the trial court improperly awarded Daniel sole educational decision-making for J.B. Despite clear language to the contrary in the judgment of allocation, Jennifer attempts to argue that the trial court's decision to designate Daniel's residence as the residential address of J.B. for school enrollment and registration purposes somehow created a "*de facto*" award of education decision-making to Daniel. We disagree. The allocation of parental decision-making is clearly allocated equally to both parties in the trial court's judgment. As stated by the trial court in its order, the "parties further acknowledge and agree that the above designation [of Daniel as the primary residential custodian] for purposes of school registration shall not be construed in any way against or in favor of either parent and shall be without precedential value or prejudice of any kind in any further litigation between the parties." Thus, the characterization that Daniel was awarded sole educational decision-making is incorrect and not in accordance with the trial court's order.

¶ 130 To the extent that Jennifer argues that the trial court erred in its decision that J.B. continue to attend the school she currently attends, we disagree. All of the evidence at trial, discussed in detail above, demonstrated that the schools, while different in size and offering slightly different extracurricular activities, were both satisfactory educational facilities. Further, the trial court's decision explicitly allows the parties to change schools or place J.B. in a private educational facility should they both feel it is necessary.

47

¶ 131 When examining the facts of this case as it relates to the education issue, it is evident from the testimony that J.B. was a successful student at Maple Grove school, was already established as a student, and that she had many friends at that school. While the smaller Maple Grove school may not offer all of the opportunities or extracurricular activities of a larger school with more resources, allowing her to continue her education where she has her entire life and not requiring her to be uprooted to a new community also offers advantages, especially for a child who is, as the testimony in this case indicates, naturally shy. Therefore, the trial court's decision to have J.B. continue attending a school that she is already familiar with, where she is already doing well, and which she has many family members living in the immediate vicinity of, is not against the manifest weight of the evidence.

¶ 132 (2) Whether the trial court's consideration of a psychological report and the investigation by the guardian *ad litem* to aid in determining the best interest of the child was an abuse of discretion.

¶ 133 First, we must address the issue of forfeiture regarding the admission of the psychological report and the GAL report, as well as the trial court's consideration of these reports when making its best interests determination for J.B. After reviewing the record on appeal, we note that both reports were admitted as evidence at trial without objection by Jennifer. It is clear throughout the testimony, especially the testimony of the GAL Hunter, that Jennifer disagreed with the recommendations of Hunter, as well as how Hunter went about investigating the case. These issues were highlighted during her counsel's examination of Hunter. However, there was no formal objection at trial to the admittance of either the psychological report or the GAL report. Thus, we find that

respondent has forfeited on appeal any argument regarding the admission of the psychological report or the GAL report. See *In re N.T.*, 2015 IL App (1st) 142391, ¶ 41 ("Generally, an issue that was not objected to during trial *** is forfeited on appeal."); *In re Jaber W.*, 344 Ill. App. 3d 250, 256 (2003) (holding that the failure to object to the admissibility of evidence on hearsay grounds at trial results in waiver of argument on appeal); *In re April C.*, 326 Ill. App. 3d 225, 242 (2001) (noting that, where a party fails to make an appropriate objection in the court below, he or she fails to preserve the issue for review). Further, we note that Jennifer admits in her reply brief on appeal that "Jennifer agreed to admit the report at trial."

¶ 134  We note as well that the trial court is not bound to follow the opinion of an expert in a case even when there is no contrary expert opinion offered. *In re Marriage of Petraitis*, 263 Ill. App. 3d at 1031-32. The trial court is free to evaluate the evidence presented and accept or reject that recommendation in whole or in part. *Id.* In her brief, Jennifer cites to *In re C.B.*, 248 Ill. App. 3d 168 (1993), for the proposition that the trial court could not rely at all on the psychological and GAL reports due to various defects. However, Jennifer misconstrues the holding in *In re C.B.* In *In re C.B.*, the court found that the trial court failed to exercise its discretion in the case because the court felt it was bound by the uncontradicted expert testimony even though the court found the basis for that testimony was founded on an incomplete investigation. *Id.* at 179-80. That is not what occurred in this case. As noted above, the trial court properly considered the best interests factors and we believe the trial court also properly undertook its role in considering and weighing the testimony of the experts.

¶ 135 (3) Whether the trial court erred in its child support calculation and in denying Jennifer's request for retroactive child support.

¶ 136 Jennifer argues that the trial court erred in calculating the amount of child support it ordered Daniel to pay Jennifer for the support of J.B. and for failing to award any retroactive child support.

¶ 137 A trial court has the discretion to determine the amount and duration of an award of maintenance and child support, "and its decision 'will not be reversed on appeal absent an abuse of discretion.' " *In re Marriage of Gabriel*, 2020 IL App (1st) 182710, ¶ 39 (quoting *In re Marriage of Walker*, 386 Ill. App. 3d 1034, 1041 (2008)). "A trial court abuses its discretion when its ruling is 'arbitrary, fanciful, or unreasonable or when no reasonable person would take the same view.' " *Id.* (quoting *In re Estate of Andre T.*, 2018 IL App (1st) 172613, ¶ 34). "We defer to a trial court's 'factual finding[s] as to the parties' annual incomes' as long as the findings are not against the manifest weight of the evidence." *Id.* (quoting *In re Marriage of Walker*, 386 Ill. App. 3d at 1041).

¶ 138 Jennifer asks this court to find the following:

> "that the income available for child support calculation purpose is Daniel's regular wages from trucking company, the income he receives from Burnett Farm[s] Inc. as wages, and the rent income from Burnett Farms, Inc. should not be a deduction for loan payments and should be considered income available for child support purposes, the depreciation should also be added back in from both companies as income for child support purposes following the holding of both *Nelson* and *Bradley*."

50

¶ 139 First, Jennifer argues that the trial court should have used the average of at least three years' worth of Daniel's income in its calculation. The trial court used the amount of income reported on Daniel's 2018 tax return, which was the most recent available year's tax return. Although there is support for the proposition that "[a]t least the three prior years should be used to obtain an accurate income picture," the number of years to consider generally "must be left to the discretion of the trial court, as facts will vary in each case." *In re Marriage of Freesen*, 275 Ill. App. 3d 97, 103 (1995).

¶ 140 In this case, the trial court could have averaged the last three years' incomes but chose not to, instead using the $55,279 amount on his 2018 tax return. Daniel's tax returns in the record demonstrate the following amounts: (1) in 2015 a total of $49,362; (2) in 2016 a total of $53,568; (3) in 2017 a total of $73,699; and (4) in 2018 a total of $55,279. As previously stated, the trial court has discretion in determining the amount of income to be assigned an individual for determining child support. In this case, the court likely considered all of the above income amounts and determined that the success of 2017, being that it is an amount approximately $20,000 more than any of the other four years, was an anomaly and not indicative of what Daniel's future income would actually be. Instead, the court may have determined that an amount that more closely represented Daniel's actual average future income would be that of his 2018 tax return, which reported an amount of $55,279. This amount, while higher than the other two incomes for years 2015 and 2016, was still within the same vicinity when compared with 2017. By averaging the last three years' incomes, the court would have reached an amount of $60,848.67. This amount is $5000 higher than any return other than the abnormally large

51

2017 tax return income, thus, it was evident to the trial court that by including the 2017 income amount, Daniel's likely anticipated future annual income was being misconstrued. Thus, we find that the trial court's decision to use the most recent year's tax return amount of $55,279 as Daniel's income for child support purposes, where the averaging of the last three years would not have produced an "accurate depiction" of the party's income due to an unusually successful year which appears to be an anomaly, does not rise to the level of abuse of discretion.

¶ 141 Second, Jennifer argues that the $80,000 cash rent payment that Daniel receives for renting his land to Burnett Farms should be considered income, and that the trial court erred in allowing Daniel to claim depreciation on his businesses.

¶ 142 Both Jennifer and Daniel cite cases in their briefs that deal with the claiming of business expenses and depreciation of business assets as it relates to the determination of child support. However, the cases cited by both parties were analyzed under the previous version of section 505 of the Act. 750 ILCS 5/505 (West 2016). Thus, while the law contained therein may be instructive as to certain aspects of the analysis, it does not offer a correct analysis of the determination of business income when awarding child support as the law stands today and at the time of the trial court's decision.

¶ 143 We agree with the holding of our colleagues in the Third District in *In re Marriage of Hochstatter*, which clarified the change in language and explained the proper analysis when addressing business deductions and depreciation for the purposes of determining child support under the new statute:

"Prior to July 1, 2017, section 505(a)(3)(h) of the Act permitted, in relevant part, deductions for '[e]xpenditures for repayment of debts that represent reasonable and necessary expenses for the production of income.' 750 ILCS 5/505(a)(3)(h) (West 2016). Thus, for an individual to successfully claim a deduction for depreciation, he or she had to establish that it was a reasonable and necessary expense for the production of income *and* that ' "it [fell] into the category of debt repayment as evidenced by a specific repayment schedule." ' [Citation.]

Effective July 1, 2017, section 505 of the Act was substantially rewritten, including the provisions applicable to calculating gross and net incomes. See Pub. Act 99-764 (eff. July 1, 2017) (amending 750 ILCS 5/505). In part, the legislature added a section for the calculation of business income. See 750 ILCS 5/505(a)(3.1) (West 2018). In relevant part, section 505(a)(3.1)(A) provided:

'(3.1) Business income. For purposes of calculating child support, net business income from the operation of a business means gross receipts minus ordinary and necessary expenses required to carry on the trade or business. *** The court shall apply the following:

(A) The accelerated component of depreciation and any business expenses determined either judicially or administratively to be inappropriate or excessive shall be excluded from the total or ordinary and necessary business expenses to be deducted in the determination of net business income from gross business income.'

*Id.* § 505(a)(3.1)(A)." (Emphasis in original.) *In re Marriage of Hochstatter*, 2020 IL App (3d) 190132, ¶¶ 22-23.

¶ 144 As is evident by a review of the change in the language of the statute, the requirement that a party establish that the deducted expense is for the repayment of a debt was removed and is no longer a requirement. Assuming no other aspect of the statute prohibits a particular type of deduction, the trial court can now review each case and in its discretion determine whether a deducted expense is one which is "ordinary and necessary *** to carry on the trade or business." If so, the trial court can allow it even if the expense is not for the repayment of a debt.

¶ 145 Here, the testimony regarding the $80,000 cash rent payment was that Daniel owns land which is currently subject to a mortgage. Both Daniel and his father testified that Daniel leases the land to his father's business to farm. The money Daniel receives in rent for the use of this property goes directly to his mortgage payment. Thus, even though it is no longer required under the current language of section 505, the undisputed testimony at trial demonstrates that the expense falls into the category of debt repayment as evidenced by the repayment schedule required under the property's mortgage. More importantly, under the current language of the statute, the expense meets the only requirement, which is that the expense is "reasonable and necessary for the production of income" because without it, Daniel would be unable to pay his mortgage, would lose the land, and there would be nothing for Daniel to lease, nor would his father's business have as much property to farm, possibly resulting in reduced wages from Daniel's employment with Burnett Farms.

¶ 146 Ultimately, the trial court found the testimony from Daniel and his father, Rollo, credible on this point and we will not disturb a credibility determination. *In re Marriage of Werries*, 247 Ill. App. 3d 639, 642 (1993) (the determination of all issues concerning the credibility of the parties and their witnesses or the weight to give the evidence lies with the trier of fact). Therefore, the trial court did not abuse its discretion in allowing for the deduction of the $80,000 rent payment from income for Daniel.

¶ 147 Next, we turn to Jennifer's claim that the trial court erred by allowing Daniel's business depreciation, which he claimed on his 2018 tax return, to be factored into the income amount used for the determination of the child support award.

¶ 148 "It is clear that section 505(a)(3.1)(A) now explicitly excludes accelerated depreciation from the calculation of net business income and does not explicitly mention nonaccelerated depreciation." *In re Marriage of Hochstatter*, 2020 IL App (3d) 190132, ¶ 24. "The implication from the continued omission of nonaccelerated depreciation from the plain language of the statute is that it could still be deducted, but only if the court, *in its discretion*, determines it to be an appropriate and reasonable business expense that is required to carry on the trade or business." (Emphasis in original.) *Id*.

¶ 149 Thus, under section 505, the court must first determine if any amount of the claimed depreciation is accelerated depreciation. If so, that amount must be excluded as it is not allowed when calculating income for the purposes of determining child support. Then the trial court must look at the nonaccelerated depreciation and decide as to whether the depreciation is an appropriate and reasonable business expense that is required to carry on the business.

55

¶ 150 In this matter, there was no testimony at trial regarding the depreciation, nor was there testimony as to what method was used to calculate the depreciation, what was being depreciated, and why such depreciation expenses are reasonable and necessary to carry on the business. One's mere acknowledgment of depreciation deductions during trial testimony or a submitting of a tax return as evidence without further explanation does not constitute "explaining the basis for the depreciation deduction." *In re Marriage of Vance*, 2016 IL App (3d) 150717, ¶ 43.

¶ 151 We note that, incredibly, nowhere in Jennifer's brief does she expand upon her claim that the deduction of depreciation was improperly allowed by the trial court. She simply offers this court the simple allegation that the trial court erred on this aspect of the case without further comment. She offers no further argument or case law to support her position. She offers no indication as to how much depreciation is being improperly allowed. She never offers this court what she believes to be the proper amount of child support. The same occurred at the trial court level where once again she simply combined the allegation with a myriad of other supposed incomes for Daniel and asked the court to calculate the child support award on its own. Accordingly, Jennifer has forfeited this issue. See *Huang v. Brenson*, 2014 IL App (1st) 123231, ¶ 22 (failure to raise an issue in the trial court generally results in forfeiture of that issue on appeal); see also Ill. S. Ct. R. 341(h) (eff. Oct. 1, 2020) (points not argued in brief on appeal are forfeited). However, forfeiture is a limitation on the parties and not on the appellate court. *Jill Knowles Enterprises, Inc. v. Dunkin*, 2017 IL App (2d) 160811, ¶ 22. As such, we can overlook

forfeiture and address an issue when it is necessary to obtain a just result or to maintain a sound body of precedent. *Id*.

¶ 152 Here, a review of Daniel's 2018 tax return, including the "Depreciation Detail Listing," reveals that in 2018, Daniel claimed $78,422 in depreciation for his trucking business and claimed $22,519 in depreciation for his farming operation. Thus, in total, Daniel deducted $100,941 in depreciation for his businesses. It appears based upon our review of the "Method" column on the "Depreciation Detail Listing" documents that all of the depreciation claimed by Daniel was calculated using various "DB" or "Declining Balance" methods which are accelerated deprecation methods. Thus, at least a portion of the depreciation deductions incorporated into Daniel's income amount for the child support calculation is explicitly prohibited under section 505.

¶ 153 Thus, as to the issue of depreciation, we vacate the court's order and remand back to the trial court with instructions to conduct an evidentiary hearing to determine what portions of the depreciation are accelerated and nonaccelerated, to exclude the accelerated portions, determine, in its discretion, whether the nonaccelerated depreciation is an appropriate and reasonable business expense that is required to carry on the businesses, and to recalculate the child support award in light of these new findings.

¶ 154 Jennifer also argues that the trial court erred by not awarding her retroactive child support. Because we have found that the child support award was improperly calculated and have remanded to the trial court for recalculation of that award in light of additional evidence or testimony regarding the depreciation claimed by Daniel, a review of this issue is premature. On remand, the trial court may exercise its discretion and determine if

an award of retroactive child support is proper in light of the new evidence and new child support calculation.

¶ 155 (4) Whether the trial court's finding that the marital estate was adequately compensated for Daniel's personal efforts in his trucking company was against the manifest weight of the evidence.

¶ 156 First, we note that neither side takes issue with the trial court's finding that reimbursement is proper. Daniel admits that due to his personal efforts some reimbursement is warranted. We, therefore, do not review that portion of the marital estate reimbursement analysis, either here or as it relates to Daniel's farming business below. Instead, we focus our attention as to whether the trial court's determination of the amount of reimbursement was against the manifest weight of the evidence.

¶ 157 "In determining whether the marital estate is entitled to reimbursement from a nonmarital business for the contribution of personal efforts of a spouse, the court may inquire as to whether the spouse was reasonably compensated by the business for those efforts." *In re Marriage of Werries*, 247 Ill. App. 3d at 648. "If the spouse has already been reasonably compensated for the personal effort, no reimbursement is necessary." *Id.*

¶ 158 Here, the trial court determined that Daniel took annual wages from Burnett Trucking, LLC, in the amount of $20,800 during the seven-year period he and Jennifer were together. The trial court then found that this "amount reflects a fair and reasonable compensation for [Daniel's] efforts [and t]he marital estate has been compensated for his personal efforts toward the non-marital trucking business," so, therefore, no reimbursement is required.

58

¶ 159 Jennifer contends this amount is not sufficient to reflect Daniel's personal efforts given the increase in value of the business during the course of the marriage. However, it is well established that "property acquired before marriage is nonmarital and its increase in value is likewise nonmarital, and income derived from such property during marriage is deemed marital." *In re Marriage of Reed*, 100 Ill. App. 3d 873, 877 (1981). Thus, just because a nonmarital asset increases significantly in value during the course of the marriage, does not change the assets' characterization as nonmarital. See *In re Marriage of Kamp*, 199 Ill. App. 3d 1080, 1083 (1990).

¶ 160 The evidence at trial demonstrated that Daniel largely left the majority of the trucking business to be operated by his assistant, Alyssa Driver. The testimony was that Alyssa did all of the billing, payroll, and coordination and logistics. Daniel testified that he does not have to seek out loads to haul anymore and that the business is able to operate mostly off of the labor of Alyssa and his truck drivers. His main contribution to the business is to make some phone calls from his tractor while he is farming for his father. He also testified that he made contacts or found jobs for the business as a natural result of farming for his father. Thus, running the business does not result in any additional work having to be done outside of his normal workday working for his father's farming business.

¶ 161 Jennifer takes great issue with this characterization of Daniel's workload as it relates to the trucking business. However, she offers no evidence to support her contentions. Further, she claims that there is a discrepancy between what Daniel testified to at trial regarding paying himself as an employee versus what the trial court ultimately

59

found. At trial, Daniel testified that he made $1000 a month as an employee of his trucking business, or $12,000 annually; however, his 2018 tax return which was also admitted as evidence, without objection, demonstrates he took a total of $20,800 in wages. Thus, Jennifer insinuates that Daniel may not have paid himself what he claimed on his 2018 tax return. Unfortunately, as the trial court notes in its July 16, 2020, letter, the evidence put on by the parties left some issues less developed than others. Importantly, Jennifer never put forth any evidence as to what the proper amount of wages Daniel should have claimed from his trucking business. She also never put forth any evidence as to how many hours a week he actually worked on the trucking business, what a similarly positioned individual would have earned in Daniel's position, or any evidence relevant to the actual determination of reimbursement to the marital estate. No experts were called to testify that what Daniel took as wages was unreasonably low. Instead, Jennifer argues that she is entitled to half of the increase of the value of the business which occurred during the marriage. This is incorrect and not in accordance with section 503 of the Act. 750 ILCS 5/503 (West 2018).

¶ 162 Further, we note that a trial court need not guess how much could have been distributed to the owner of a business had they chosen to reduce the size of their operation or modify how the business was run, as long as the party seeking reimbursement, and therefore the marital estate, was reasonably compensated for the other party's efforts. *In re Marriage of Werries*, 247 Ill. App. 3d at 649. Moreover, as previously discussed regarding conflicting testimony and evidence, "[a reviewing court] will not second guess the trial judge's determinations regarding credibility of witnesses."

60

*In re Marriage of Petraitis*, 263 Ill. App. 3d at 1035. Here, the trial court obviously did not find Daniel's testimony to be not credible.

¶ 163  Thus, due to the lack of evidence presented by Jennifer and in light of the evidence offered by Daniel, we do not find that the trial court's determination that the marital estate had adequately been compensated was against the manifest weight of the evidence.

¶ 164  (5) Whether the amount of reimbursement Daniel was ordered to make to the marital estate for his personal efforts relating to his farming business was against the manifest weight of the evidence.

¶ 165  The same law as was previously discussed in the above section regarding reimbursement for Daniel's personal efforts towards his trucking business applies to our analysis under this section regarding Daniel's farming business.

¶ 166  Again, Jennifer makes a similar claim arguing that the trial court's reimbursement award is against the manifest weight of the evidence in light of the significant increase in the value of Daniel's farming business over the course of the marriage.

¶ 167   Before we begin our analysis, we offer one quick clarification. Burnett Farms is a separate business owned by Daniel's father. Daniel works for this business as an employee and receives annual wages of approximately $37,000. This is not the farming business we are discussing here. Daniel also has his own farming business (Daniel Burnett Farms) which he reports as a "Schedule F" on his tax returns. This is the farming business we are referring to here.

¶ 168  The trial court found Daniel Burnett Farms to be nonmarital property because the business was initially formed prior to the marriage of the parties and the 500 acres of

farmland were also purchased prior to the marriage. The characterization of Daniel Burnett Farms as nonmarital is not disputed.

¶ 169 The trial court noted that the value of the land had significantly increased by approximately $400,000 over the course of the marriage. The court discussed the evidence presented at trial that the increase of the value of the farmland was largely due to the market value of farmland in general increasing in the Massac County area since the purchase of the land. However, the trial court also found that Daniel did put in significant personal efforts to maintain and improve the farmland during the course of the marriage. Further, the trial court noted that none of the income received from Daniel Burnett Farms was ever contributed to the marital estate, nor did Daniel ever pay himself wages or an annual salary for his personal efforts put into farming and leasing the land. Thus, the trial court determined that reimbursement for Daniel's personal efforts towards Daniel Burnett Farms to the marital estate was proved and necessary. This is also not disputed by the parties.

¶ 170 The trial court then asked, "How much is the marital estate to be reimbursed for the seven-year period that the parties were living together[?]" The trial court acknowledged once again that the parties could have presented more evidence as to this issue and more thoroughly developed their arguments. However, the trial court ultimately concluded that "considering the evidence, which was presented on Daniel Burnett Farms and Burnett Trucking, LLC, the [trial c]ourt has considered that the yearly amount that should have been contributed to the marital estate from Daniel Burnett Farms would be

$20,800.00, this also being the amount that was contributed to the marital estate from Burnett Trucking, LLC."

¶ 171 The trial court then explained its calculation of the amount due to Jennifer, which was one-half of the annual contribution to the marital estate ($10,400) multiplied by the number of years the parties were together (seven years), totaling $72,800.

¶ 172 Once again, Jennifer offers this court no recommendation as to what a proper reimbursement amount should be, but instead argues that she is entitled to receive half of the increase in value of the farm. We reiterate that a significant increase in the value of a nonmarital asset during the course of the marriage does not change the assets' characterization as nonmarital. See *In re Marriage of Kamp*, 199 Ill. App. 3d at 1083. Therefore, Jennifer is not entitled to any increase in the value of the business that did not arise directly from the personal efforts of Daniel. The only evidence presented at trial is that Daniel worked on Daniel Burnett Farms at the same time he was running Burnett Trucking, LLC, and working for his father as an employee. There is no evidence as to how many hours he worked for Daniel Burnett Farms, what income outside of the leasing of his land came from his personal efforts, or any evidence as to what a person similarly situated should expect to earn or receive from such work.

¶ 173 The record simply offers no evidence of Daniel's personal efforts towards his farming business or its value other than the assumption that the amount of work likely mimicked that of his work for Burnett Trucking, LLC, considering it was all being done simultaneously.

¶ 174 Therefore, because Jennifer offered little to no evidence regarding the issue she now claims, we cannot find that the circuit court, in relying on the evidence put forth by Daniel at trial and awarding a reimbursement amount similar to that of the other business Daniel operated simultaneously, made a ruling that is against the manifest weight of the evidence.

¶ 175 (6) Whether the trial court abused its discretion when it divided the marital estate and denied Jennifer's request for an award of maintenance.

¶ 176 Jennifer argues that the trial court abused its discretion in the manner in which it divided the marital estate. It is well established that the trial court's "decisions concerning the distribution of marital property lie within the sound discretion of the trial court and will not be disturbed on appeal absent an abuse of that discretion." *In re Marriage of Heroy*, 385 Ill. App. 3d 640, 661 (2008).

¶ 177 Jennifer contends on appeal that she should have been awarded the majority of the marital estate due to the higher net worth of Daniel resulting from his nonmarital businesses. Thus, Jennifer contends that the court's "even split" of the estate was an abuse of discretion.

¶ 178 We initially note that the marital estate was not awarded in a complete even split. Jennifer was awarded $120,000 for her interest in the marital home which was agreed to by the parties. She received $72,800 from Daniel's reimbursement to the marital estate for his personal efforts. She was also awarded her entire retirement account which was estimated to be worth more than $55,000 at the time of the trial, some of which was marital property which could have been split between the parties, and half of Daniel's

Northwestern Mutual accounts worth approximately $99,000. The parties were awarded the marital property, consisting of household furniture, furnishings, and appliances, which they had in their possession. Regarding vehicles and bank/depository accounts each party was awarded that titled to and in possession of them. Thus, while the marital property amounts between the parties was closely divided, Jennifer was awarded slightly more in that she was awarded her entire retirement account even though some of it was marital property. Jennifer also retained her nonmarital real estate property worth $60,000.

¶ 179 Jennifer argues that, in light of Daniel's nonmarital business values, she should have been awarded the entire marital estate or at least a majority of it to make up for this inequity.

¶ 180 Daniel's businesses, while no doubt valued at considerable amounts, are nonmarital property. A trial court can consider assets that the parties retain and are awarded. However, this is just one factor. See 750 ILCS 5/503(d) (West 2018). There are many others which must be considered. Relevant here is the length of the marriage, which was only seven years. *Id.* § 503(d)(4). Also relevant are the incomes and earning capacities of the parties. *Id.* § 503(d)(5), (8), (11). Based upon evidence at trial, Jennifer makes approximately $47,000 a year and her job is a stable one which she expects to retire from in the next one to three years. Daniel's income was approximately $55,000. While slightly more per year than Jennifer's income, Daniel's income fluctuates more, and his businesses require the risk of taking out large loans to help fund operations as evidenced by his tax returns and bank documents submitted as exhibits. Further, much of his companies' worth appears to consist of vehicles and equipment necessary for the

operation of the businesses. Moreover, we note Daniel's testimony, and the Illinois Farm Business Farm Management report, demonstrated how the profitability of farming had declined in the years preceding the trial.

¶ 181 Jennifer's sole argument as to why the distribution was made in error is due to the perceived amount of wealth tied up in Daniel's nonmarital businesses. However, when those assets are viewed more objectively, the parties are similarly situated, and an approximately equal distribution, following a seven-year marriage, with Jennifer retaining slightly more of the marital property, cannot be found to be an abuse of discretion.

¶ 182 As to the issue of maintenance, Jennifer's brief only mentions that she was not awarded any, and then after discussing the division of the marital estate issue at length, asks this court, "In the alternative, this Court should find that the trial court abused its discretion in not awarding Jennifer maintenance and should reverse and remand this case to the trial court and order maintenance." Generally, "a trial court's determination as to the awarding of maintenance is presumed to be correct." *In re Marriage of Donovan*, 361 Ill. App. 3d 1059, 1063 (2005). "Because maintenance awards are within the sound discretion of the trial court, we will not disturb a maintenance award absent an abuse of discretion." *In re Marriage of Heroy*, 385 Ill. App. 3d at 650. "An abuse of discretion exists only where we can conclude that no reasonable person would take the view adopted by the trial court." *Id.* at 651. "It is the burden of the party challenging the maintenance award to show an abuse of discretion." *Id.*

¶ 183 Here, Jennifer fails to articulate any argument, authority, or reasoning in her brief as to why the trial court erred in failing to award her maintenance. Thus, we find she has failed to meet her burden and do not find that the trial court, which is much better positioned for these types of determinations, abused its discretion.

¶ 184 (7) Whether the trial court's award of attorney fees was an abuse of discretion.

¶ 185 Following the trial, the trial court ordered Daniel to pay an additional $5500 towards Jennifer's attorney fees. This amount is in addition to $4500 which Daniel paid earlier in the litigation and brings the total amount of Jennifer's attorney fees paid by Daniel to $10,000. Jennifer now argues that the trial court abused its discretion by not awarding her more. At the time of trial, Jennifer testified that she anticipated attorney fees in the amount of $75,000 by the time the litigation ended.

¶ 186 "Section 508 of the Dissolution Act allows for an award of attorney fees where one party lacks the financial resources and the other party has the ability to pay." *In re Marriage of Schneider*, 214 Ill. 2d 152, 174 (2005); 750 ILCS 5/508 (West 2018). "The party seeking an award of attorney fees must establish her inability to pay and the other spouse's ability to do so." *In re Marriage of Schneider*, 214 Ill. 2d at 174. "Financial inability exists where requiring payment of fees would strip that party of her means of support or undermine her financial stability." *Id*. "In addition, a trial court's decision to award or deny fees will be reversed only if the trial court abused its discretion." *Id*.

¶ 187 A court abuses its discretion when its findings are arbitrary or fanciful or where no reasonable person would agree with its position. *In re Marriage of Sanfratello*, 393 Ill. App. 3d 641, 646 (2009); *Blum v. Koster*, 235 Ill. 2d 21, 36 (2009). In determining

whether the circuit court abused its discretion the question is not whether this court might have decided the issue differently. *In re Marriage of Patel*, 2013 IL App (1st) 112571, ¶ 95. A reviewing court is not justified in substituting its discretion for that of the circuit court. *In re Marriage of Lee*, 78 Ill. App. 3d 1123, 1127 (1979).

¶ 188  The trial court in its September 11, 2020, order stated that it made the decision to award the $5500 after it had "considered all relevant factors including the criteria for division of marital property, the ability of each party to pay their own bills, their financial resources, the cost[-]conscious approach of each party to litigation, and any unnecessary increase in the cost of litigation."

¶ 189 The record demonstrates that based upon their tax returns, both Jennifer and Daniel made approximately the same amount of money each year, with Daniel having considerable wealth tied up in his nonmarital business assets. Other than Jennifer's testimony that she struggled to pay bills, there was no evidence presented as to what her monthly expenses were, why she was unable to pay her bills, or any other information regarding why she was struggling financially to the extent claimed. We find it odd that Jennifer in her brief stated that she "plans to retire from Shawnee in August of 2021."[4] The ability of one to retire in the near future often signals some type of financial stability.

¶ 190 Daniel testified that he had only incurred somewhere between $40,000 and $50,000 in attorney fees and that involved representation by two attorneys simultaneously. The trial court expressly noted in its July 16, 2020, letter that the

_____

[4]Jennifer in her brief states that she is planning to retire in August 2021; however, her testimony at trial was that she would retire in August 2024. In either event, Jennifer is planning to retire within the next few years.

representation of the parties in this case by their attorneys was somewhat lackluster. He was extremely critical of the amount of time it took to litigate the case given that the action spanned over the course of five years.

¶ 191 Based upon the evidence before this court, we find that the trial court did not abuse its discretion in awarding a combined total of $10,000 in attorney fees given the evidence discussed above. While there might be a disparity in the parties' net worth, there is not a significant disparity in the parties' annual incomes. Thus, a reasonable person could easily find that the award of $10,000 was a proper amount. Further, the trial court is in a better position to determine whether some of the costs of representation may have been excessive or unnecessary. Thus, the trial court did not abuse its discretion when it awarded a combined total of $10,000 in attorney fees to Jennifer.

¶ 192                                          CONCLUSION

¶ 193 For the foregoing reasons, we affirm in part and vacate in part the final orders of the circuit court of Massac County entered on September 11, 2020. Specifically, we affirm in its entirety the trial court's judgment of allocation of parental responsibilities, and vacate in its entirety the order of support, and vacate in part the amended judgment of dissolution that addresses the support awards, while affirming the remaining portions of the amended judgment of dissolution. We remand the vacated portions to the circuit court with instructions to conduct an evidentiary hearing to determine what portions of the depreciation are accelerated and nonaccelerated; to exclude the accelerated portions; determine, in its discretion, whether the nonaccelerated deprecation is an appropriate and reasonable business expense that is required to carry on the businesses; to recalculate the

child support award in light of these new findings; and redetermine in light of this new award if retroactive child support is warranted.

¶ 194  Affirmed in part, vacated in part, and remanded with instructions.